Affirmed by published opinion. Judge DUNCAN wrote the majority opinion, in which Judge WILKINSON concurred. Judge DAVIS wrote a dissenting opinion.
OPINION
DUNCAN, Circuit Judge:
This appeal arises from the district court’s grant of summary judgment to newspaper publishers bringing a First Amendment challenge to a public airport’s total ban on newspaper racks inside its terminals. We found a similar ban unconstitutional in Multimedia Publishing Co. of South Carolina, Inc. v. Greenville-Spartanburg Airport District, 991 F.2d 154 (4th Cir.1993), which guides our decision today. Because the government interests asserted to justify the ban do not counterbalance its significant restriction on protected expression, we affirm.[1]
I.
As this is an appeal from a grant of summary judgment, we present the facts affecting our First Amendment analysis in the light most favorable to the appellant. See Pueschel v. Peters, 577 F.3d 558, 563 (4th Cir.2009). Appellant Raleigh-Durham Airport Authority (the “Authority”) was chartered by the North Carolina General Assembly to operate the Raleigh-Durham International Airport (the “Airport”). See 1939 N.C. Pub.L. ch. 168. Appellees The News and Observer Publishing Company; The Durham Herald Company; The New York Times Company; and Gannett Company, Incorporated (the “Publishers”) publish and distribute four daily newspapers: The News & Observer, The Herald-Sun, The New York Times, and USA TODAY.

A.

The Arport facilitates air travel for the region known as the “Triangle area,” which encompasses Raleigh, Durham, and Chapel Hill, North Carolina. Every year millions of travelers pass through the Ar-port. During the relevant time period, the Arport consisted of two terminals, labeled A and C, that shared one attached parking deck and eleven outer parking lots reachable by shuttle bus. Each terminal had a non-secure area for ticketing and baggage pickup, and a secure area or “concourse” for loading and unloading passengers on planes. Whereas anyone could access the non-secure areas, only ticketed travelers and authorized personnel could enter the secure areas. Entering a secure area required passing through a security checkpoint operated by the Transportation Se *574 curity Administration (“TSA”).[2]
The Airport was intended not only to facilitate air travel but also to generate revenue. Federal law requires making the facility as financially self-sustaining as possible. See 49 U.S.C. § 47107(a)(13) (conditioning federal grant money upon “the airport owner or operator ... maintaining] a schedule of charges for use of facilities and services at the airport ... that will make the airport as self-sustaining as possible”). The Authority generated revenue for the Airport in various ways, including (1) leasing wall space for advertising, (2) charging a fixed rent to shops and restaurants inside each terminal, and (3) charging additional rent calculated as ten percent of gross profits.
Inside each terminal were numerous shops and restaurants, located mostly within the secure area where travelers waited before departing. These concessions, which included various eating establishments and retail stores, were selected and arranged under “a master plan for the retail and food service concession space” designed to “maximize customer service and ... revenue to the Authority.”[3] J.A. 265. The terminals also contained vending machines, racks displaying brochures, information kiosks, television monitors, ATM machines, email stations, shoe-shine stations, trash bins, bathrooms, plants, and other features intended to serve travelers or boost revenue.
In early 2002, the Publishers contacted the Authority about placing coin-operated newsracks inside the terminals, where newsracks had never been placed before. At that time, newspapers could only be purchased from various shops. Terminal A’s secure area had four shops selling newspapers. Three “RDU-Press” shops were located by Gates 5, 8, and 14/16, and an “RDU-Press Plus” shop was located by Gate 19. Terminal A’s non-secure area had a “JQ Snacks” kiosk near the baggage claim area that offered USA Today. Terminal C’s secure area had two shops selling newspapers. These were the “Hudson News” shop and the “Hudson News and Book” shop located near the TSA security checkpoint. Finally, Terminal C’s non-secure area had one shop selling newspapers located between the baggage claim and ticketing areas. All these shops could offer any newspaper selection they chose, but the Authority generally expected them to carry The News & Observer and The Herald-Sun.
Although the Airport was open to the public twenty-four hours every day, the shops normally opened between 5:30 a.m. and 6:30 a.m., and closed between 8:00 p.m. and 9:00 p.m. They were “required to open before the first flights [left] ... each *575 morning and remain open until after the last flights departed] each evening.” J.A. 296. Among the five hundred or so flights that arrived at or departed from the Airport every day, however, about thirty-seven were scheduled to arrive after the shops had closed. Passengers aboard these flights or any flights delayed beyond the normal hours were therefore unable to purchase a newspaper.
The record also reflects other issues regarding the adequacy of newspaper circulation. For example, the Authority received complaints that newspapers were sometimes unavailable during the early morning hours. Furthermore, The Durham Herald Company received complaints that the shops sold out of The Herald-Sun. Notwithstanding, the Authority declined to regulate how many newspapers were stocked, reasoning that the shops had a financial incentive to meet demand.
B.
In January 2002, The News and Observer Publishing Company (the “Observer”) inquired about the possibility of placing newsracks inside the terminals. In response, the Authority asserted “an informal policy that newspapers would be distributed via the newsstands/gift shops in the terminals,” and explained that “there had been no complaints from customers with respect to newspapers being available only in those shops.” J.A. 230-31. The Authority also raised concerns about security, floor space, and losing revenue from shop sales.
The Observer and Authority did not discuss newsracks again until about two years later. On February 17, 2004, the Observer faxed a letter to the Authority asserting that its ban on newsracks would unlikely survive First Amendment scrutiny, requesting permission to place and stock “a limited number of newsracks at locations in the terminal and on the concourses ... without charge,” and promising that the news-racks would be “as ‘security friendly’ as technology currently allows.” J.A. 167. The Authority refused this request. On March 31, 2004, the Observer faxed another letter asserting “the right to place [Observer] newsracks on the concourses” and threatening litigation, but the Authority again refused. J.A. 168.
On September 2, 2004, the Publishers sued the Authority in the Eastern District of North Carolina. Their complaint alleged that the Authority’s refusal to allow newsracks inside the terminals violated the First Amendment and North Carolina Constitution. The Publishers requested both injunctive relief and attorneys’ fees and costs under 42 U.S.C. § 1988 and 28 U.S.C. § 1920. Specifically, the Publishers sought a permanent injunction letting them place 208 newsracks in 26 locations throughout the Airport terminals.[4]
The Authority and Publishers filed cross-motions for summary judgment under Federal Rule of Civil Procedure 56. After initially denying both motions, the district court amended its decision and granted the Publishers’ motion for summary judgment regarding their First Amendment claim. See The News & Observer Publ’g Co. v. Raleighr-Durham Airport Auth, 588 F.Supp.2d 653, 659 (E.D.N.C.2008). The court reasoned that banning “the installation of news racks within the terminals ‘substantially burdens the newspaper companies’ expressive con *576 duct within that public place,’ ” id. at 658 (quoting Multimedia, 991 F.2d at 159), and that concerns about security, aesthetics, preserving revenue, and preventing congestion were not “sufficiently powerful interests to justify the burden on protected expression,” id. This appeal followed.
II.
On appeal, the Authority challenges the district court’s grant of summary judgment. We “review[ ] a district court’s decision to grant summary judgment de novo, applying the same legal standards as the district court.” Pueschel, 577 F.3d at 563. Summary judgment should be granted “if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Fed.R.Civ.P. 56(c)(2). Facts are “material” when they might affect the outcome of the case, and a “genuine issue” exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party is “entitled to judgment as a matter of law” when the nonmoving party fails to make an adequate showing on an essential element for which it has the burden of proof at trial. See Cleveland v. Policy Mgmt. Sys. Corp., 526 U.S. 795, 804, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999). “[I]n ruling on a motion for summary judgment, the nonmoving party’s evidence is to be believed, and all justifiable inferences are to be drawn in that party’s favor.” Hunt v. Cromartie, 526 U.S. 541, 552, 119 S.Ct. 1545, 143 L.Ed.2d 731 (1999) (internal quotations omitted). To overcome a motion for summary judgment, however, the nonmoving party “may not rely merely on allegations or denials in its own pleading” but must “set out specific facts showing a genuine issue for trial.” Fed.R.Civ.P. 56(e).
The Publishers’ complaint alleged that the Authority’s total ban on newsracks inside the terminals violated the First Amendment. Multimedia addressed a similar challenge on appeal from a final judgment after a bench trial. The district court there found that the Greenville-Spartanburg Airport Commission’s (the “Commission”) ban on newsracks inside the Greenville-Spartanburg International Airport (“GSP”) violated the First Amendment.
GSP had two terminals, labeled A and B, that were connected by both a direct walkway and a ticketing area with walkways leading to each terminal. Newspapers could be purchased either from a newsrack located in the parking deck or from a souvenir shop located between terminal A and the ticketing area. The shop was open from 6:30 am. to 9:00 p.m. and had a sign advertising the newsrack outside, but travelers using terminal B were unlikely to pass the shop. Likewise, travelers not using the parking deck were unlikely to pass the newsrack.
We held that “the First Amendment protects distribution as well as publication” of newspapers and that “modes of distribution involving permanent or semi-permanent occupation of publicly-owned property don’t lose First Amendment protection because of that fact.” Multimedia, 991 F.2d at 158. After noting that the Commission allowed only limited means of newspaper distribution, we upheld the district court’s decision that concerns about aesthetics, preserving revenue, preventing congestion, and security failed to justify the heavy restriction on protected expression. See id. at 160-63.
Although the procedural posture here differs, Multimedia provides the substantive legal framework for our analysis. *577 In deciding whether government property-should be made available for protected expressive activity such as newspaper distribution, we apply different levels of protection for different types of government property. See id. at 162; see also Perry Educ. Ass’n v. Perry Local Educators’ Ass’n, 460 U.S. 37, 44-46, 103 S.Ct. 948, 74 L.Ed.2d 794 (1983). Stringent protection applies for “public forums,” i.e., “places which by long tradition or by government fiat have been devoted to assembly and debate,” but less protection applies for “nonpublic forums,” i.e., “[p]ublie property which is not by tradition or designation a forum for public communication.” Perry, 460 U.S. at 45-46, 103 S.Ct. 948. The Supreme Court has declared that airports are nonpublic forums. See Int’l Soc’y for Krishna Consciousness, Inc. v. Lee, 505 U.S. 672, 679-80, 112 S.Ct. 2701, 120 L.Ed.2d 541 (1992). Accordingly, the following protection applies in this case: “In addition to time, place, and manner regulations, the State may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker’s view.1991 F.2d at 159 (quoting Perry, 460 U.S. at 46, 103 S.Ct. 948).
12,3] Because no one argues that the Authority’s total ban on newsracks inside the terminals discriminated based on viewpoint, we need only consider its reasonableness. See id. “[R]easonableness ... must be assessed ‘in the light of the purpose of the forum and all the surrounding circumstances.’ ” Id. (quoting Cornelius v. NAACP Legal Def. & Educ. Fund, Inc., 473 U.S. 788, 809, 105 S.Ct. 3439, 87 L.Ed.2d 567 (1985)). Although the ban “need not be the most reasonable or the only reasonable limitation” on protected expression, “it isn’t enough simply to establish that the regulation is rationally related to a legitimate governmental objective, as might be the case for a typical exercise of the government’s police power.” Id. Instead, Multimedia requires the following analysis:
The degree and character of the impairment of protected expression involved, discounted by any mitigating alternatives that remain to the aggrieved party, must be considered.... The validity of any asserted justification for the impairment must then be assessed and, if found valid, then weighed in the balance against the impairment.... Because regulations other than mere time, place, and manner restrictions must be designed to reserve the forum for its intended purposes, the overall assessment must be undertaken with an eye to the intended purposes of this particular airport terminal and of the ways in which the regulated conduct ... might actually interfere with the carrying out of those purposes.
Id. (internal quotations and citations omitted). Consistent with Multimedia, but through the lens of summary judgment, we now consider whether the Authority’s total ban on newsracks inside the terminals was reasonable.[5]
A.
First we measure the Authority’s restriction on the Publishers’ protected ex *578 pressive activity, namely, newspaper distribution. This analysis hinges not upon a projected difference in newspaper sales but rather upon the Publishers’ access to Airport users for speech purposes. See Lee, 505 U.S. at 684, 112 S.Ct. 2701 (upholding a regulation “limiting solicitation ... to the side-walk areas outside ... [airport] terminals” and reasoning that, because “[t]his sidewalk area is frequented by an overwhelming percentage of airport users, ... the resulting access of those who would solicit the general public is quite complete”). Among other things, we consider the extent to which people visiting the Airport could have received the Publishers’ message by buying their newspapers. See Multimedia, 991 F.2d at 160 (reasoning that “the Commission’s news-rack ban makes newspapers hard to come by for many patrons of the Greenville-Spartanburg Airport and impossible for others, thereby placing a heavy burden on the newspaper companies’ protected distribution activity”).
Even drawing all reasonable inferences in the Authority’s favor, we are constrained to find that its total ban on news-racks inside the Airport’s terminals significantly restricted the Publishers’ ability to distribute newspapers. The record reflects that travelers had trouble buying newspapers from the shops. There were instances of unavailability during the early morning, and the shops would sell out of The Herald-Sun. Furthermore, the Authority concedes that newspapers were unavailable once the shops closed each day around 9:00 p.m. This means that passengers aboard the thirty-seven flights scheduled to arrive after that time or aboard flights delayed past that point could never purchase a newspaper upon landing. The Publishers’ ability to reach these people inside the terminals was thus nonexistent. Finally, the Airport’s tightly contained character enhanced this burden on newspaper distribution. See id. (“If a governmental entity imposed a similar ban on newsrack placement on city streets and sidewalks, those desiring a paper might find private vendors on nearby private property taking advantage of a newly created market; but the Airport’s ban offers no similar opportunity for patrons or vendors.”). For these reasons, we conclude that the Authority’s total ban on news-racks inside the terminals significantly restricted the Publishers’ protected expression.
B.
Next we determine whether the Authority asserted legitimate interests that counterbalance the restriction on protected expression. Given that the Authority may “reserve the forum for its intended purposes,” our analysis here must keep in mind the Airport’s intended purposes of facilitating air travel and raising revenue. Perry, 460 U.S. at 46, 103 S.Ct. 948. We also note that the Authority “need not have adduced specific factual evidence that its interests were advanced by the ban or that the expressive activity banned did interfere with the forum’s intended use.” Multimedia, 991 F.2d at 160. Instead, the Authority generally “was entitled to advance its interests by arguments based on appeals to common sense and logic.” Id.
The Authority asserts four interests to justify totally banning newsracks inside the terminals: aesthetics, preserving revenue, preventing congestion, and security. We recognize the legitimacy of these interests. See id. at 161 (noting that government interests in aesthetics and preserving revenue are legitimate); Lee, 505 U.S. at 683-85, 112 S.Ct. 2701 (deeming legitimate the government interest in preventing congestion); Jacobsen v. City of Rapid City, *579 128 F.3d 660, 662-63 (8th Cir.1997) (deeming legitimate the government interest in airport security). Below we consider whether they counterbalance the significant restriction on protected expression.
1.
First, we consider the Authority’s interest in preserving the Airport’s aesthetics. Although arguments based solely on logic or common sense normally are allowed, Multimedia stated that asserting an “interest in aesthetics ..., without more, isn’t sufficient to ... permit the restriction of protected expression.” Multimedia, 991 F.2d at 161. We added that aesthetic concerns have been found substantial enough to justify restricting protected expression only where “the aesthetic harm has been both substantial and widely recognized,” and noted “that the speech restricted has often been of low First Amendment value.” Id. (citations omitted).
The Authority has offered no evidence that placing news-racks inside the Airport’s terminals would cause substantial and widely recognizable aesthetic harm. Nor does common sense or logic support that conclusion. We cannot see how an appropriate number of carefully placed newsracks fashioned to complement each terminal’s interior design would have substantially undermined the Airport’s aesthetics. Moreover, the Authority has proffered no justification to distinguish newsracks from the vending machines, racks displaying brochures, ATM machines, and other visual obtrusions that existed inside the terminals. For these reasons, we conclude that the Authority’s aesthetic interest cannot counterbalance the significant restriction on protected expression.
2.
Second, we consider the Authority’s interest in preserving revenue. The Authority argues that we should adopt its business judgment under the “concession master plan,” which excludes newsracks but purports to maximize revenue. J.A. 265. The Authority also proffered expert testimony that letting people buy newspapers from newsracks would affect shops’ sales not only of newspapers but also of snacks and other items that customers seeking newspapers might purchase on impulse. Fewer sales would mean less revenue for the Authority, which received ten percent of shops’ gross profits.
At the very least, these arguments fail to address the significant restriction on protected expression we identified, namely, that the Publishers cannot distribute newspapers inside the terminals to passengers arriving when the shops are closed, and that at times newspapers are otherwise unavailable. We cannot see, and indeed the Authority has offered no evidence or rational explanation for, how allowing newsracks in such circumstances could detract from sales or affect revenue.
Furthermore, we are not persuaded by the Authority’s reliance on the master plan for concessions. Nothing in the record or briefs suggests that, when the master plan was being developed, its creators even considered newsracks. Accordingly, that the plan excludes newsracks provides no basis for concluding that placing some number inside the terminals would be inconsistent with maximizing revenue.
Finally, Multimedia considered and rejected a similar argument about lost revenue on the ground that the Commission “could have exacted a concession for papers sold from news-racks equal to that assessed against the shop.” Multimedia, 991 F.2d at 161. We do not foreclose that *580 possibility here.[6] For these reasons, we conclude that the Authority’s interest in preserving revenue cannot counterbalance the significant restriction on protected expression.
3.
Third, we consider the Authority’s interest in preventing congestion. The Authority draws support from the following description of newsracks:
A standard newsrack projects twenty inches into a passenger movement corridor. An object of this size reduces the pedestrian traffic flow capacity of the corridor by 42 people per minute. A USA TODAY type newsrack, being used by a standing customer with the cabinet door fully extended, reduces pedestrian traffic flow capacity by 110 people per minute, without allowing for any baggage placed on the floor while the device is in use.
Gannett Satellite Info. Network, Inc. v. Berger, 716 F.Supp. 140, 153 (D.N.J.1989), rev’d on other grounds, 894 F.2d 61 (3d Cir.1990). The Authority might well posit a government interest against spreading a large number of newsracks indiscriminately throughout the terminals, but that is not the scenario presented. The Authority has not simply prohibited a large number of newsracks from being randomly spread around the terminals; it has banned them all. Accordingly, we need only consider how much congestion would result from a “limited number” of carefully placed news-racks — the amount requested by the Observer’s February 17, 2004, letter. J.A. 167.
Having properly framed the question, we are ultimately bound by Multimedia. There, we stated that “common sense” allays fears of congestion around newsracks. Multimedia, 991 F.2d at 162. We reasoned that, because the Supreme Court found the congestion at an airport created by “a large number of peaceful leafletters seeking out passersby and attempting to engage them in dialogue” insufficient to justify banning that expressive activity, id. at 162 (citing Lee, 505 U.S. at 690, 112 S.Ct. 2701 (O’Connor, J., concurring)), “the obviously trivial congestion-related difficulties posed by carefully placed inanimate news-racks cannot justify the Commission’s ban either,” id. Accordingly, we find here that a limited number of carefully placed newsracks would create only trivial congestion.[7] Cf. Ayres v. City of Chicago, 125 F.3d 1010, 1013 (7th Cir.1997) (“The incremental contribution to congestion that five peddlers can make in a sea of hundreds of thousands of festival-goers is very small.”).
Furthermore, the record reflects the presence of numerous free-standing objects inside the terminals. The Authority proffers no basis on which to distinguish newsracks from the plants, vending machines, racks displaying brochures, ATM *581 machines, email stations, trash bins, and similar objects already present. For these reasons, we conclude that the Authority’s interest in preventing congestion cannot counterbalance the significant restriction on protected expression.
4.
Finally, we consider the Authority’s interest in maintaining security within the Airport. The Authority contends that newsracks could become hiding places for bombs or weapons, and that stocking them would require letting delivery persons through TSA security checkpoints. In support, the Deputy Airport Director for Operations Mike McElvaney provided an affidavit stating that placing newsracks throughout the Airport would create security risks and burden security personnel, who would need to screen delivery persons and repeatedly check newsracks for contraband. Notably, McElvaney confined his analysis to “the information provided by the Plaintiffs in this action identifying 26 locations where they want to place 208 news racks at the Airport.” J.A. 316.
Without in any way diminishing the importance of security concerns, we again note the extent to which the Airport’s evidence misses the mark. McElvaney premised his analysis on the existence of 208 newsracks throughout the Airport. The Authority, however, has banned all news-racks inside the terminals. McElvaney’s analysis indicates little about the security risk created by allowing a carefully calibrated newsrack presence. Such risk could not be more than de minimis. We find Multimedia particularly instructive on this point: “The Federal Aviation Administration has no safety or security regulations addressed to newsracks, and proper design would render them highly unsuitable for bomb placement.... The incremental danger to airport security posed by newsracks is entirely de minimis.” Multimedia, 991 F.2d at 162 (internal citation omitted).
In addition to being facially overbroad, the Authority’s evidence has “fail[ed] to distinguish the security impact of news-racks frpm that of other places in the terminal where a weapon or bomb can be placed, such as, restrooms, trash cans, various plants placed in the terminal for aesthetic purposes, and within newsstands and kiosks.” News & Observer, 588 F.Supp.2d at 659; see also Jacobsen, 128 F.3d at 663 (dismissing a similar concern “because the terminal has many other places where a bomb could be hidden, such as waste containers and plant holders, and if anything, the glass door on the front of a newsrack makes it a less suitable place to hide a bomb.”). We therefore conclude that the Authority’s security interest cannot counterbalance the significant restriction on protected expression.
In sum, the record contains insufficient evidence from which a reasonable jury could conclude that the Authority’s asserted interests justify the total ban on news-racks inside the terminals. Nor does the record support the conclusion that carefully placing an appropriate number of news-racks inside the terminals would be incompatible with the Airport’s intended purposes of facilitating air travel and raising revenue. Cf. Multimedia, 991 F.2d at 163 (“Nothing in the evidentiary record of this case, or in the Commission’s arguments, suggests that a reasonably controlled placement of a limited number of newsracks in this terminal would significantly, if at all, interfere with either the primary or secondary intended purposes of its operation.”). For the reasons stated above, we

AFFIRM.

. This appeal also involves a challenge to the district court’s order awarding attorney's fees and costs under 42 U.S.C. § 1988 and 28 U.S.C. § 1920. The appellant contends that by awarding "those fees and expenses the publishers incur from December 2008 through the conclusion of this case,” J.A. 1171, the court granted a " 'blanket' award of attorney's fees ... without any mechanism for evaluating the reasonableness of the prospective fees,” Appellant's Br. at 62. Nothing in the court’s order, however, suggests that the publishers would ever be entitled to attorney’s fees and costs without proving their reasonableness. Therefore, we find no error and affirm.

. The Airport was substantially renovated after this litigation began. Terminal C was demolished, a brand new terminal was constructed, and the Airport's terminals are now labeled 1 and 2. The Authority moved to supplement the record on appeal to reflect this renovation, but we denied its motion. See Kirkpatrick v. Lenoir County Bd. of Educ., 216 F.3d 380, 384 (4th Cir.2000) ("From a procedural standpoint, courts hearing a case on appeal are limited to reviewing the record that has been developed below.”).

. In 1998, the Authority hired consultant Ann Ferraguto "to plan and implement a master plan for the retail and food service concession space within the airport terminals.” J.A. 265. The Authority implemented that plan in 2000 by reorganizing concession space inside each terminal and entering new concession contracts. No single document comprises the entire "master plan,” but the Authority stated during oral argument that Ingrid Hairston’s memorandum dated July 10, 2000, provides a reliable summary. Nothing in the record suggests that anyone involved in developing the master plan ever considered placing news-racks inside the terminals.

. Although it provides factual context, this request does not affect our First Amendment analysis. We decide today only whether the Authority violated the Constitution by banning any newsracks inside the terminals, not whether 208 newsracks should be mandated. That and other remedial issues remain for another day.

. The Authority contends that we should apply a different analysis, assessing reasonableness without weighing asserted justifications against the restriction on protected expression, because its ban on newsracks inside the terminals arose from a business judgment. See Appellant's Br. at 28-32. We disagree. Because the ban considered in Multimedia also resulted from a business judgment, this case cannot be distinguished from Multimedia on that basis.

. Once again, we stress the limited nature of our inquiry. We consider only whether banning all newsracks inside the terminals violated the First Amendment. Such issues as number, placement, and cost are beyond the scope of our analysis.

. That Multimedia applied a different legal standard makes no difference. Its holding about congestion was based on common sense rather than factual evidence, and summary judgment does not require ignoring logic or common sense to favor the nonmoving party. See Nat’l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 743 (1st Cir.1995) (“While the summary judgment mantra requires us to draw every reasonable inference in favor of the nonmoving party, inferences, to qualify, must flow rationally from the underlying facts; that is, a suggested inference must ascend to what common sense and human experience indicates is an acceptable level of probability.”).