**PUBLISHED**
Filed: July 13, 2010

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

THE NEWS AND OBSERVER
PUBLISHING COMPANY; THE DURHAM
HERALD COMPANY; THE NEW YORK
TIMES COMPANY, GANNETT
COMPANY, INCORPORATED,

*Plaintiffs-Appellees,*

v.

RALEIGH-DURHAM AIRPORT
AUTHORITY,

*Defendant-Appellant.*

No. 09-1010

## O R D E R

RDU's petition for rehearing en banc is before the Court. A poll of the Court was requested, and failed to garner the approval of a majority of the qualified active judges. Judges Niemeyer, Motz, Gregory and Davis voted in favor of rehearing en banc. Chief Judge Traxler, Judges Wilkinson, King, Shedd, Duncan, Agee and Keenan voted to deny. Judge Michael did not participate. Rehearing en banc is therefore denied.

Entered at the direction of Judge Duncan for the Court.

For the Court

/s/ Patricia S. Connor
Clerk

WILKINSON, Circuit Judge, concurring in the denial of rehearing en banc:

I was pleased to join Judge Duncan's fine opinion for the court, *News and Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570 (4th Cir. 2010), and add only these few words to the thoughtful discussion of my two colleagues on the panel. This case involves the total absence of any newspaper dispensers at a public facility of a sort where such newsracks often are present, the unwillingness of the Authority even to consider the expressive interests at stake, and the further unwillingness of the Authority to explore alternatives that would be entirely compatible with the facility's customary operations. The upshot of all this is to subordinate the clear First Amendment interest in the dissemination of ideas to the slightest administrative inconvenience, an odd and diminished place indeed for our foremost enumerated right.

Publications like newspapers are near the First Amendment's core; the Framers in fact thought to mention the press. Further, as the Supreme Court has recognized, "[l]iberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value." *Lovell v. City of Griffin*, 303 U.S. 444, 452 (1938) (quoting *Ex parte Jackson*, 96 U.S. 727, 733 (1877)). For that reason, the Court has twice before struck down restrictions on newsracks. *See Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993); *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988).

The only reason this case gives any pause is because it concerns an airport, which is not considered a "public forum" for First Amendment purposes. *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee [ISKCON v. Lee]*, 505 U.S. 672, 680-83 (1992). But the fact "[t]hat airports are not public fora, however, does not mean that the government can restrict speech in whatever way it likes." *Id.* at 687 (O'Connor, J., concurring in *ISKCON v. Lee* and concurring in the judgment in *Lee v. Int'l Soc'y for Krishna Consciousness [Lee v. ISKCON]*, 505 U.S. 830 (1992)). For while airports should not be confused with Speaker's Corner, the First Amendment has not wholly passed them by. Judged only by our airports, we might well appear a more informed people than we are. Airports typically offer a variety of publications for travelers to purchase, reflecting the fact that travel is one of those times when Americans are particularly desirous of the opportunity to read. After all, travelers dealing with not infrequent flight delays have more time with the paper than they might at the breakfast table.

Thus a ban on all newsracks at an airport is anything but trivial. Resolution of the issue on summary judgment was entirely appropriate—after all, that is exactly what the Supreme Court did in the *ISKCON* cases. *See ISKCON v. Lee*, 505 U.S. at 677. The record presented to us in this case establishes two propositions beyond dispute: that the publishers were denied access to many potential readers and that the Airport Authority provided little more than speculation to justify so sweeping a restriction.

The hit-or-miss availability of papers in retail shops serves only to underscore the barriers the Authority's policy places in the way of newspaper publishers and readers. Here the record indicated that the retailers championed by the Authority not infrequently opened without papers in the morning, ran out during the day, and closed before the last passengers arrived or departed. The reality of the burden was further corroborated by complaints received from newspaper customers

who lamented their inability to buy papers at the Airport. Although the parties dispute exactly where to pin the blame for some of these difficulties, it is beyond dispute that the ban on newsracks was a total one and that the current system simply is not working in a manner consistent with the rudimentary promise of the First Amendment.

The Authority claimed its total newsrack ban was justified by revenue, security, congestion, and aesthetic concerns. But those claims suffered from the fact that the Authority allowed installations dispensing every other item a traveler might conceivably buy. In the secure portion of the Airport, these included prepaid telephone card dispensers, shoe shine stands, ATMs, pay e-mail machines, spa stations, and payphones. The Authority even had plans to add iPod vending machines. Outside the security cordon, the Authority made room for racks with free publications, vending machines offering floral bouquets, soft drinks, snacks, and luggage carts, and even for a display motorcycle. The Authority supplied no reason capable of withstanding even light scrutiny to think that core political speech should be uniquely disfavored relative to the cornucopia of other commercial products and services travelers could obtain outside the retail shops.

*ISKCON v. Lee* itself held similarly based on the view that the authority "is operating a shopping mall as well as an airport." *Lee v. ISKCON*, 505 U.S. at 688-89 (O'Connor, J. concurring in *Lee v. ISKCON* and concurring in the judgment in *ISKCON v. Lee*) (noting that the airport housed "restaurants, cafeterias, snack bars, coffee shops, cocktail lounges, post offices, banks, telegraph offices, clothing shops, drug stores, food stores, nurseries, barber shops, currency exchanges, art exhibits, commercial advertising displays, bookstores, newsstands, dental offices, and private clubs."). Moreover, the Supreme Court has recognized that the distribution of First Amendment materials is entitled to protection that ordinary commercial activities are not. "Newspapers are in the business of expression, while soda vendors are in the business of sell-

ing soft drinks." *City of Lakewood*, 486 U.S. at 761. Here, however, that relationship was inverted. I have the greatest respect for the Airport Authority's desire to provide an array of amenities to travelers, but there does come a point when public restriction of political speech should not take a complete backseat to lemonade and motorcycles.

In defending its newsrack ban, the Authority put particular emphasis on revenue generation. It generally is appropriate to defer to the business judgment of administrators who manage quasi-commercial government enterprises—but only when that judgment has actually been exercised. When managers say "no" simply because saying "no" is easier than having even to think about the First Amendment, we may not rubber-stamp decisions. Asked how inanimate and unobtrusive newsracks would be less compatible with Airport operations than other vending machines, the Authority's Business Development Officer replied, "I don't know that they would interfere more or differently. But for me that's not really the point. I think the point is that we make decisions to limit how much and what we put where." J.A. 950.

The Authority tried to substantiate its revenue claims by noting that its "master concession plan" did not call for newsracks. But the Authority conceded that the consultants who devised the plan never considered the costs or benefits of newsracks. And once it is understood that the plan did not address the issue, we have no basis to conclude the Authority's ban reflected anything other than "a bureaucratic unwillingness to explore alternatives." *Multimedia Publishing Co. of South Carolina v. Greenville-Spartanburg Airport District*, 991 F.2d 154, 163 (4th Cir. 1993). Indeed, the record was clear on this point. The Authority's Airport Director explained that the decision to reject the publishers' request was made for a very simple reason: "until we see a good reason to change the practice that we have been following, we're going to stick with that practice." J.A. 979. And apparently, the First Amendment did not qualify as a "good reason."

I do recognize there may be some inconvenience to the Authority in having to consider the First Amendment interest. But it is blackletter law that free speech is not to be wholly subordinated to administrative convenience. "[T]he First Amendment does not permit the State to sacrifice speech for efficiency." *Riley v. Nat'l Fed'n of Blind*, 487 U.S. 781, 795 (1988). Instead, some accommodation of expressive rights and governmental interests is the touchstone of that Amendment, even in those instances where the strictest scrutiny is not applied. Indeed, to place a judicial imprimatur on the sweeping refusal of a public entity to concede the slightest value to the role of political speech would be to permit the marketplace of ideas to be converted to a regulated industry like insurance or electricity—precisely what the First Amendment has long refused to countenance.

The Authority contends that our decision will "take from public airport authorities control over their passenger terminals." Pet. Reh'g at 3. Nothing could be further from the truth. This is an entirely equitable matter, there having been no request for damages, and the bench trial our friend in dissent would require seems scarcely different from the remedial proceedings that will follow in any event. At the remedial phase, the Authority's altogether legitimate interests in revenue, security, congestion, and aesthetics must be taken into account. In *Lee v. ISKCON*, the Supreme Court required an airport to accommodate live pamphleteers. *See Lee v. ISKCON*, 505 U.S. at 830. What the publishers requested here is far more innocuous, and in any event, their wishes are not the Constitution's command. Nothing in our decision dictates to the Authority how many newsracks it must allow or how they must be accommodated. The panel took pains to "stress the limited nature of our inquiry. We consider only whether banning all newsracks inside the terminals violated the First Amendment. Such issues as number, placement, and cost are beyond the scope of our analysis." *News and Observer,* 597 F.3d at 580 n.6; *see also id.* at 575 n.4.

The point is not to establish a policy of favoritism in this setting, but simply to hold fast to the principle that free speech is not to be uniquely disfavored. It must be remembered that a newsrack ban like the one in place primarily restricts political speech and that "[p]olitical speech, of course, is at the core of what the First Amendment is designed to protect." *Morse v. Frederick*, 551 U.S. 393, 403 (2007). An informed citizenry is at the heart of this democracy, and narrowing the arteries of information in the manner sought by the Authority will only serve to impair our country's coronary health.

DUNCAN, Circuit Judge, concurring:

With profound respect, I must question why an appeal which the dissent characterizes as presenting "a rather pedestrian issue" would warrant *en banc* review. Our circuit precedent squarely holds that a total ban on newsracks implicates the First Amendment. And while undoubtedly there are many factual questions that inhere in a determination of the appropriate relief for a constitutional violation, there remains no factual dispute whatsoever about the current existence of what the Supreme Court, in another context, has characterized as "the inexorable zero." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 342 n.23 (1977) (internal quotations omitted).

DAVIS, Circuit Judge, dissenting from the denial of rehearing en banc:

Despite its profound constitutional trappings, this appeal presents a rather pedestrian issue: whether the summary judgment record reflects the existence of genuine disputes of material fact regarding the reasonableness of the Airport Authority's ban on newspaper racks (not newspapers themselves, of course) under our precedent in *Multimedia Publ'g Co. v. Greenville-Spartanburg Airport Dist.*, 991 F.2d 154 (4th Cir. 1993). I believe (as did the district court, before,

inexplicably, it changed its mind) that such disputes are presented. Therefore, the Airport Authority is entitled to a trial.

This case is not about whether a Jehovah's Witness can be required to obtain a permit to pamphlet on a city street. *Lovell v. City of Griffin*, 303 U.S. 444, 451-52 (1938). Furthermore, it is more than a stretch to make the blanket statement that "the [Supreme] Court has twice before struck down restrictions on newsracks." Statement of Wilkinson, J., concurring in the denial of rehearing en banc (citing *Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410 (1993), and *Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750 (1988)). In fact, *Discovery Network* simply prohibited *discrimination* among newsrack owners based on the relative "commercialness" of the items distributed by newsrack. 507 U.S. at 430 ("The regulation is not a permissible regulation of commercial speech, for on this record it is clear that the interests that Cincinnati has asserted are unrelated to any distinction between 'commercial handbills' and 'newspapers.'"). And in *Lakewood*, a plurality of four justices simply concluded that, "those portions of the Lakewood ordinance giving the mayor unfettered discretion to deny a permit application [for newsracks in the city's business district] and unbounded authority to condition the permit on any additional terms he deems 'necessary and reasonable,' to be unconstitutional." 486 U.S. at 772 (brackets added). Notably in the latter case, Justices Stevens and O'Connor joined Justice White's dissenting opinion, in which he stated: "The Court quite properly does not establish any constitutional right of newspaper publishers to place newsracks on municipal property. . . . [O]ur precedents suggest that an outright ban on newsracks on city sidewalks would be constitutional, particularly where (as is true here) ample alternative means of 24-hour distribution of newspapers exist." *Id.* at 773 (White, J., dissenting) (ellipsis and brackets added).

But neither in my dissenting opinion nor in this brief statement do I intend to project the final outcome of the merits of the dispute in this case. Rather, I simply emphasize that, prop-

erly viewed, where there exist genuine disputes of material fact, a trial is neither a nuisance nor a triviality, because, under the rule of law, process matters. And this is true whether or not the outcome of a trial is "scarcely different," Statement of Wilkinson, J., concurring in the denial of rehearing en banc, from the result reached by some other means of reasoned judgment. *Cf. Crawford v. Washington*, 541 U.S. 36, 62 (2004) ("Dispensing with confrontation because testimony is obviously reliable is akin to dispensing with jury trial because a defendant is obviously guilty.").

I regret the denial of rehearing en banc.