**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-2078**

SAMUEL R. BALLENGEE,

Plaintiff - Appellant,

v.

CBS BROADCASTING, INC.; CBS NEWS, INC.; JIM AXELROD; ASHLEY VELIE; and SCOTT PELLEY,

Defendants - Appellees.

Appeal from the United States District Court for the Southern District of West Virginia, at Charleston. Joseph R. Goodwin, District Judge. (2:17-cv-00212)

Argued: January 29, 2020                                    Decided: August 3, 2020

Before KEENAN, WYNN, and RUSHING, Circuit Judges.

Affirmed by published opinion. Judge Rushing wrote the opinion, in which Judge Keenan and Judge Wynn joined.

**ARGUED:** James D. McQueen, Jr., MCQUEEN DAVIS, Huntington, West Virginia, for Appellant. Michael D. Sullivan, BALLARD SPAHR LLP, Washington, D.C., for Appellees. **ON BRIEF:** Christopher J. Heavens, HEAVENS LAW OFFICES, Charleston, West Virginia, for Appellant. Thomas V. Flaherty, Wesley P. Page, FLAHERTY SENSABAUGH BONASSO PLLC, Charleston, West Virginia; Jay Ward Brown, Maxwell S. Mishkin, BALLARD SPAHR LLP, Washington, D.C., for Appellees.

RUSHING, Circuit Judge:

In 2016, CBS Evening News aired two reports on the opioid crisis in West Virginia that featured Samuel "Randy" Ballengee and his pharmacy. Ballengee sued, alleging among other things that the news reports were defamatory. The district court granted summary judgment in favor of the defendants on all claims. Ballengee now appeals the district court's ruling as to only two allegedly defamatory statements in the reports. Because we agree with the district court that there can be no material dispute of fact that those statements were substantially true, we affirm.

I.

A.

Randy Ballengee opened Tug Valley Pharmacy in Williamson, West Virginia in 2007. When he opened the pharmacy, Ballengee was aware that two pain management clinics were within a two-block radius: Mountain Medical Care Center (Mountain Medical) and Dr. Diane Shafer's office.

During the first few years it was open, Tug Valley Pharmacy filled a large number of prescriptions for controlled substances from Mountain Medical and Dr. Shafer's office. Many of those prescriptions were for pain medications—hydrocodone, oxycodone, Endocet, Vicodin, Lorcet, and Lortab—all of which are considered opioids. In a "customer profile" Tug Valley Pharmacy completed for one of its drug distributors, it disclosed that 66% of all prescription drugs purchased at the pharmacy were controlled substances. By contrast, "in a typical retail pharmacy, controlled substances might amount to between five and twenty percent of the pharmacy's purchases." Southwood Pharm., Inc., 72 Fed. Reg.

2

36,487, 36,492 (Dep't of Just. July 3, 2007) (revocation of registration) (internal quotation marks omitted). In 2009 alone, Tug Valley Pharmacy filled 42,115 hydrocodone prescriptions, which averages to 162 hydrocodone prescriptions per business day. Many of those prescriptions for hydrocodone and other controlled substances were filled for patients of Dr. Shafer and Mountain Medical. For example, in 2008, Tug Valley Pharmacy filled 10,195 prescriptions for controlled substances from Dr. Shafer and 11,111 prescriptions for controlled substances from doctors at Mountain Medical. Similarly, in 2009, Tug Valley Pharmacy filled 17,055 prescriptions for controlled substances from Dr. Shafer and 29,027 prescriptions for controlled substances from Mountain Medical. By comparison, Tug Valley Pharmacy filled a total of 65,532 prescriptions for controlled substances from all providers in 2009. On seven occasions from 2008 to 2009, Tug Valley Pharmacy filled more than 150 prescriptions for pain medication from Mountain Medical alone in a single day.

In 2009, Dr. Shafer came under investigation for improperly distributing controlled substances. She ultimately surrendered her license to practice medicine, pleaded guilty to conspiring to misuse a Drug Enforcement Administration (DEA) registration number, and was sentenced to six months in federal prison. After a law enforcement raid in 2010, Mountain Medical also was closed for improperly prescribing controlled substances.

From 2010 to 2012, former customers of Tug Valley Pharmacy filed several lawsuits against the pharmacy and Ballengee. *See* Compl., *Collins v. Tug Valley Pharmacy, LLC*, No. 10-C-251 (W. Va. Cir. Ct. Mingo Cnty. Aug. 24, 2010); Compl., *Salmons v. Shafer*, No. 11-C-332 (W. Va. Cir. Ct. Mingo Cnty. June 17, 2011); Compl.,

3

*Collins v. Tug Valley Pharmacy, LLC*, No. 12-C-38 (W. Va. Cir. Ct. Mingo Cnty. Feb. 21, 2012). The lawsuits alleged that Ballengee and Tug Valley Pharmacy negligently or recklessly filled prescriptions for controlled substances and contributed to the customers' addictions. As part of these civil suits, one customer testified that he saw drug deals occur right outside of Tug Valley Pharmacy and that the pharmacy would fill narcotic prescriptions before their refill date, particularly if the customer paid in cash. Another customer testified that the pharmacy was crowded whenever she arrived to pick up a prescription, with some customers "slumped over" and "totally out of their mind," and other customers completing drug deals right outside. J.A. 1198. The customers also alleged that one doctor from Mountain Medical, Dr. Ryckman, "was not at [Mountain Medical] in Williamson except for one time after 2005 although his name and DEA number were continuously used for prescriptions for narcotics which [Tug Valley Pharmacy and others] continuously filled." J.A. 399.

Ballengee was deposed in connection with one of these lawsuits. During the deposition, Ballengee admitted that he filled prescriptions written by Dr. Ryckman even though he never once saw him in person or spoke with him. Ballengee also confirmed, more generally, that he filled high numbers of pain prescriptions from Mountain Medical, testifying as follows:

> Q: What would be in the ballpark when Dr. Hoover and [Mountain Medical] were in their prime, so-to-speak, how many prescriptions would you say you fill a day from there?
>
> A: It would be an estimate, maybe 150 to 200.
>
> . . .

4

Q:  Those would be if not 100 percent controlled substances, certainly a large part of that 150 would be for a controlled substances, wouldn't it?

A:  Most of their patients got more than just pain medication and nerve medication.

Q.  I understand, but virtually, everyone of them got some pain medication, didn't they?

A.  Most of them did.

J.A. 252–255.  These civil suits remain pending.

In 2012, the State of West Virginia sued eleven pharmaceutical drug distributors for contributing to the prescription drug abuse problem in West Virginia.  Compl., *West Virginia v. AmerisourceBergen Drug Corp.*, No. 12-C-141 (W. Va. Cir. Ct. Boone Cnty. June 26, 2012); Second Am. Compl., *AmerisourceBergen*, No. 12-C-141.  The State did not name any pharmacies as defendants, but the complaint discussed several pharmacies' practices.  The State described Tug Valley Pharmacy, along with two other pharmacies in Williamson, as "among the most notorious of the pill mill pharmacies in Southern West Virginia."  Second Am. Compl. at 31, *AmerisourceBergen*, No. 12-C-141.  Elsewhere the complaint described Tug Valley Pharmacy as a "pill mill pharmacy . . . located within yards of two notorious pill mill physicians," whose "voluminous illegal prescriptions written for non-medical purposes were filled daily by this pharmacy."  *Id.* at 15.  The State further alleged that one distributor should have been alarmed by the "volume of oxycodone and hydrocodone pills distributed to Tug Valley Pharmacy" given, among other things, the town's small population and the pharmacy's proximity to "pill-pushing physicians whose reputations were both well-known and the subject of extensive publicity."  *Id.* at 36–37.

5

In January 2016, CBS Evening News began a series on the opioid crisis in West Virginia. The second report in the series aired on January 7. Host Scott Pelley opened the segment by noting that West Virginia was "suing, accusing pharmacies and drug distributors of making millions pushing narcotics to anyone who wants them." J.A. 510. The segment included an interview with attorney James Cagle, who represents the State in the lawsuit against the distributors. In the interview, CBS correspondent Jim Axelrod discussed one pharmacist who lost his license and spent time in prison "for illegally dispensing drugs." J.A. 511. Axelrod then described Tug Valley Pharmacy, stating:

> But Cagle told us the problem persists. This pharmacy, Tug Valley, is now being sued for negligently filling prescriptions. Records show Tug Valley was filling more than 150 pain prescriptions a day from one clinic alone.
>
> . . .
>
> We decided to ask owner Randy Ballengee about the charges.

J.A. 511. The report then showed Ballengee declining to be interviewed.

Following the January 7 broadcast, one of Tug Valley Pharmacy's distributors, McKesson, terminated its supply agreement with the pharmacy. After McKesson terminated the contract, Ballengee was unable to find a distributor to sell him controlled substances. In March 2016, Ballengee sold Tug Valley Pharmacy.

On May 25, 2016, CBS broadcast the fourth report in its series on the opioid crisis. J.A. 608–614. In that report, Jim Axelrod stated:

> West Virginia is suing McKesson. . . . The suit alleges that while West Virginia was drowning in painkillers, McKesson continued to incentivize sales with bonuses for the sale of oxycodone and hydrocodone.

6

> Last winter we traveled to this small Appalachian town where we found Tug Valley Pharmacy, which until January was supplied by McKesson.
>
> . . .
>
> We discovered that pharmacist Randy Ballengee is facing several lawsuits for negligence, admitting to filling 150 pain pill prescriptions daily for one clinic alone.

J.A. 611–612. The report then showed the same footage of Ballengee declining to be interviewed. Axelrod then stated that "McKesson terminated its contract with Tug Valley, but only after learning about the charges from our CBS News investigation, raising the question: why hadn't the company discovered that on its own?" J.A. 612.

Since the CBS Evening News series, the opioid crisis in West Virginia has also captured the attention of Congress. A report prepared by staff for the House Committee on Energy and Commerce observed that one distributor's analysis found that "a single doctor prescribed more than 158,000 doses of hydrocodone dispensed by Tug Valley Pharmacy in February 2008." Staff of H. Comm. on Energy & Commerce, 115th Cong., Red Flags and Warning Signs Ignored: Opioid Distribution and Enforcement Concerns in West Virginia 18 (2018). A second doctor prescribed 40,000 doses. *Id.* Together, "these two doctors prescribed, and Tug Valley Pharmacy dispensed, nine times the then-monthly volume for an average retail pharmacy in rural West Virginia." *Id.* The distributor reported its concerns to the DEA in April 2008, including that "two doctors wrote 87 percent of the hydrocodone prescriptions filled by Tug Valley Pharmacy." *Id.* at 19.

B.

On January 6, 2017, Ballengee sued CBS Broadcasting, Inc., CBS News, Inc., CBS News correspondent Jim Axelrod, CBS Evening News producer Ashley Velie, and CBS Evening News anchor and managing editor Scott Pelley (collectively, CBS), alleging defamation, false light invasion of privacy, tortious interference, and intentional infliction of emotional distress. Ballengee contended that two statements and three implications from the January 7 and May 25 news reports were defamatory. Specifically, Ballengee alleged that the following two statements defamed him: (1) "Records show Tug Valley was filling more than 150 pain prescriptions a day from one clinic alone," and (2) "We discovered that pharmacist Randy Ballengee is facing several lawsuits for negligence, admitting to filling 150 pain pill prescriptions daily for one clinic alone." Ballengee also alleged that CBS defamed him by implying (1) that Ballengee or his pharmacy was sued by the State of West Virginia, (2) that Ballengee was criminally charged or was currently under investigation by the State of West Virginia or federal authorities, and (3) that Ballengee intentionally acted illegally, acted immorally, or contributed to the opioid epidemic for profit.

Following discovery, CBS moved for summary judgment, which the district court granted on all claims. Regarding defamation and false light invasion of privacy, the district court concluded that the allegedly defamatory statements were substantially true and the allegedly defamatory implications were substantially true, were not capable of a defamatory meaning, or were not reasonably implied by the reports. Ballengee timely appealed, challenging only the district court's rulings on his defamation and false light invasion of privacy claims.

8

## II.

### A.

We review de novo a district court's decision to grant summary judgment, applying the same legal standards as the district court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party. *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010). Summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are material when they might affect the outcome of the case, and a genuine issue exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co.*, 597 F.3d at 576 (internal quotation marks omitted). If the nonmoving party "has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof," summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

As a court exercising diversity jurisdiction pursuant to 28 U.S.C. § 1332, the district court appropriately applied West Virginia choice-of-law principles. J.A. 1208 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941), and *Wells v. Liddy*, 186 F.3d 505, 521 (4th Cir. 1999)). West Virginia employs a place-of-injury rule for tort cases; therefore, West Virginia law applies to this case. *McKinney v. Fairchild Int'l, Inc.*, 487 S.E.2d 913, 922 (W. Va. 1997).

B.

Ballengee contends that the district court erred by concluding that no reasonable juror could find that the two allegedly defamatory statements in the CBS reports were false, rather than substantially true. The essential elements of a defamation claim in West Virginia are "(1) defamatory statements; (2) a nonprivileged communication to a third party; (3) falsity; (4) reference to the plaintiff; (5) at least negligence on the part of the publisher; and (6) resulting injury." *Crump v. Beckley Newspapers, Inc.*, 320 S.E.2d 70, 77 (W. Va. 1983). As to the element of falsity, "'[t]he common law of libel takes but one approach . . . regardless of the form of the communication. It overlooks minor inaccuracies and concentrates upon substantial truth.'" *State ex rel. Suriano v. Gaughan*, 480 S.E.2d 548, 561 (1996) (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 516–517 (1991)). "'Minor inaccuracies do not amount to falsity so long as the substance, the gist, the sting, of the libelous charge be justified.'" *Id.* (quoting *Masson*, 501 U.S. at 516–517). Therefore, "[a] 'statement is not considered false unless it would have a different effect on the mind of the reader from that which the pleaded truth would have produced.'" *Id.* at 562 (quoting *Masson*, 501 U.S. at 517); *see also In re Callaghan*, 796 S.E.2d 604, 627 (W. Va. 2017).

A claim for false light invasion of privacy similarly requires that "the matter publicized as to the plaintiff must be untrue." *Crump*, 320 S.E.2d at 87. Therefore, our analysis of this element applies to both causes of action.

The two statements of which Ballengee complains are: (1) "Records show Tug Valley was filling more than 150 pain prescriptions a day from one clinic alone," and

10

(2) Ballengee "admit[ed] to filling 150 pain pill prescriptions daily for one clinic alone." As an initial matter, Ballengee is correct that he did not literally state in his deposition that he was filling 150 pain prescriptions daily for one clinic alone. Rather, he testified that he filled "maybe 150 to 200" prescriptions per day from Mountain Medical, a pain management clinic, and that "most of" its patients "got some pain medication." J.A. 252–255. But we agree with the district court that no reasonable juror could find that the broadcast statement "'would have a different effect on the mind of the [viewer] from that which the pleaded truth would have produced.'" *Suriano*, 480 S.E.2d at 562 (quoting *Masson*, 501 U.S. at 517). The substance, gist, or sting of the broadcast statement was that Ballengee had admitted to filling a high volume of pain prescriptions daily, even from just one clinic. Ballengee's deposition testimony—that he filled "150 to 200" prescriptions daily from one pain clinic and "most of" those patients received "some pain medication"— would have produced a similar effect on the viewer as the broadcast statement. That is, the broadcast statement was "'substantially' true in overall effect," and therefore insufficient to establish falsity. *In re Callaghan*, 796 S.E.2d at 627.

Turning to the statement that "[r]ecords show" Tug Valley Pharmacy was filling 150 pain prescriptions a day from one clinic, Ballengee's deposition testimony provides support for that characterization as well. Moreover, as the district court noted, West Virginia Board of Pharmacy records show that, on at least seven occasions from 2008 to 2009, Tug Valley Pharmacy did in fact fill more than 150 prescriptions for pain medication from Mountain Medical in a single day. *See* J.A. 1212 & n.8. More generally, those records also show that Tug Valley Pharmacy filled an average of 162 hydrocodone

11

prescriptions alone per business day in 2009. J.A. 311, 1196; *see also* J.A. 311 (records showing that Tug Valley Pharmacy filled 79,286 hydrocodone prescriptions in 2008–2009, which averages to 152 hydrocodone prescriptions per business day, without accounting for holidays). And, as noted in the House Energy and Commerce Committee Report, one of Tug Valley Pharmacy's distributors had reported to the DEA in April 2008 that two doctors wrote 87 percent of the hydrocodone prescriptions filled at the pharmacy. Staff of H. Comm. on Energy & Commerce, at 19.

We agree with the district court that no reasonable juror could find that the broadcast statement—that records showed Tug Valley Pharmacy filled 150 pain prescriptions a day from one clinic—"'would have a different effect on the mind of the [viewer] from that which the pleaded truth would have produced.'" *Suriano*, 480 S.E.2d at 562 (quoting *Masson*, 501 U.S. at 517). The pleaded truth, undisputed by Ballengee, is that on seven occasions from 2008 to 2009, Tug Valley Pharmacy filled more than 150 pain prescriptions in a single day from one clinic; Tug Valley Pharmacy filled more than 160 hydrocodone prescriptions per day on average in 2009; a majority of those pain prescriptions came from only two clinics; and Ballengee had admitted in his deposition to filling a high volume of pain prescriptions from Mountain Medical per day. The broadcast statement was "'substantially' true in overall effect," *In re Callaghan*, 796 S.E.2d at 627, and the sting of the statement—that Tug Valley Pharmacy was filling a suspiciously high number of pain prescriptions, including prescriptions from a single clinic—was justified by the facts, *see Suriano*, 480 S.E.2d at 561; *cf. Walters v. City of Kenova*, No. 17-0451, 2018 WL 2174129, at *4 (W. Va. May 11, 2018) (concluding, for the purpose of a defamation claim, that there

12

was no difference between the sting of a reported arrest for possession of hydrocodone and a reported arrest for possession of cocaine).  Because Ballengee failed to offer evidence from which a reasonable juror could find that the allegedly defamatory statements in the CBS reports were false, rather than minor inaccuracies, and he bears the burden of proof on this element of his defamation and false light invasion of privacy claims, summary judgment on both claims was appropriate.

## C.

Ballengee has not challenged on appeal the summary judgment rulings regarding the three defamatory implications he alleged in the district court.  Those claims are therefore forfeited on appeal. *See Wilson v. Prince George's Cnty.*, 893 F.3d 213, 218 n.6 (4th Cir. 2018); *see also* Fed. R. App. P. 28(a)(8)(A) ("[T]he argument . . . must contain . . . appellant's contentions and the reasons for them.").

Ballengee does, however, attempt to raise for the first time on appeal two new implications of the news reports: (1) that he was filling high numbers of pain prescriptions in 2016 at the time the broadcasts aired, and (2) a "guilt by association relationship" between Tug Valley Pharmacy and McKesson.  Br. of Appellant 26.  "[I]ssues raised for the first time on appeal generally will not be considered," absent "very limited circumstances, such as where refusal to consider the newly-raised issue would be plain error or would result in a fundamental miscarriage of justice." *Muth v. United States*, 1 F.3d 246, 250 (4th Cir. 1993).  Ballengee does not argue that any exception to our general rule applies here.  He specifically identified only three allegedly defamatory implications

13

for the district court, and his failure to provide the district court with an opportunity to consider these two additional implications forecloses his ability to raise them now.

*　　*　　*

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*