**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

INTERNATIONAL SOCIETY FOR
KRISHNA CONSCIOUSNESS OF
CALIFORNIA, INC., a California
nonprofit, religious corporation and
EMIL BECA, one of its individual
members,

*Plaintiffs-Appellants*,

v.

CITY OF LOS ANGELES, a California
Municipal Corporation; STEPHEN
YEE, Airport Manager; BERNARD J.
WILSON, Chief of Airport Police,

*Defendants-Appellees*.

No. 12-56621

D.C. No.
2:97-cv-03616-
CBM-JC

OPINION

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, Senior District Judge, Presiding

Argued and Submitted
May 16, 2014—Pasadena, California

Filed August 20, 2014

Before: John T. Noonan and Kim McLane Wardlaw,
Circuit Judges, and Roslyn O. Silver, Senior District
Judge.[*]

Opinion by Judge Noonan

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's summary judgment
in an action brought by the International Society of Krishna
Consciousness and the group's president challenging section
23.27(c) of the Los Angeles Administrative Code, which bans
continuous or repetitive solicitation for the immediate receipt
of funds at Los Angeles International Airport.

The panel held that major international airports have a
legitimate interest in controlling pedestrian congestion and
reducing the risk of fraud and duress attendant to repetitive,
in-person solicitation for the immediate receipt of funds. The
panel held that because section 23.27(c) is limited in nature
and leaves open alternative channels for plaintiffs to raise
money, the ordinance acts as a reasonable restriction on
protected speech under the First Amendment.

---

[*]   The Honorable Roslyn O. Silver, Senior District Judge for the U.S.
District Court for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has
been prepared by court staff for the convenience of the reader.

## COUNSEL

David Liberman, Los Angeles, California; and Robert C. Moest, Santa Monica, California, for Plaintiffs-Appellants.

John M. Werlich, Westlake Village, California, for Defendants-Appellees.

## OPINION

NOONAN, Circuit Judge:

The International Society for Krishna Consciousness of California, Inc., along with Emil Beca, the group's president (collectively, "ISKCON"), appeals the district court's grant of summary judgment in favor of the City of Los Angeles ("City"), Los Angeles International Airport ("LAX") manager Stephen Yee, and LAX police chief Bernard J. Wilson (collectively, "Appellees").

After nearly two decades of litigation, the only remaining legal issue in this case is whether section 23.27(c) of the Los Angeles Administrative Code[1]—which bans continuous or repetitive solicitation for the immediate receipt of funds at LAX, a nonpublic forum—is a reasonable restriction on protected speech under the First Amendment.

---

[1] Effective June 19, 2000, section 23.27(c) was deleted and reenacted as section 171.02(c) of the Los Angeles Municipal Code. Consistent with the standard practice in this case, we nevertheless refer to the ordinance as section 23.27(c).

Because ISKCON has failed to raise a genuine issue of material fact as to whether section 23.27(c) is a reasonable restriction on speech in light of LAX's lawful purpose, we affirm.

## I

### A

LAX occupies some 3,500 acres of land southwest of downtown Los Angeles. Each year, more than 60 million travelers pass through its doors, making it one of the world's busiest airports.

Including Tom Bradley International Terminal ("TBIT"), LAX has nine separate terminals arranged along the outside edge of a horseshoe-shaped configuration of multilevel roadways. The upper roadway services the departure areas, while the lower roadway services arrivals. At each terminal, the roadways are flanked continuously with sidewalks ranging in length from 440 to 876 feet and in width from 12 to 30 feet. A substantial majority of travelers must cross the sidewalks to enter or exit the terminals, as must any greeters or well-wishers. The parking structures lie in the horseshoe's interior.

Following the terrorist attacks of September 11, 2001 ("9/11"), LAX adopted significant changes to its security protocols. As part of these changes, the maximum terminal space available to the general public decreased from 4,000,000 to 211,000 square feet—a reduction of about ninety-five percent. A significant portion of that previously available space has since been occupied by the Transportation Security Administration ("TSA") and its passenger screening

infrastructure. Concession and retail establishments are now mostly located in sterile areas of LAX's terminal buildings and are not open to the general public.

Enacted four years prior to 9/11, section 23.27(c) of the Los Angeles Administrative Code provides, in relevant part:

> (c)(1) No person shall solicit and receive funds inside the airport terminals at the Airport.
>
> (2) No person shall solicit and receive funds in the parking areas at the Airport.
>
> (3) No person shall solicit and receive funds on the sidewalks adjacent to the airport terminals or the sidewalks adjacent to the parking areas at the Airport.
>
> (4) Subdivisions (c)(1), (c)(2), and (c)(3) apply only if the solicitation and receipt of funds is conducted by a person to or with passers-by in a continuous or repetitive manner. Nothing herein is intended to prohibit the distribution of flyers, brochures, pamphlets, books, or any other printed or written matter as long as such distribution is not made with the intent of immediately receiving funds, as defined in subdivision (c)(5), at the locations referred to in (c)(1), (c)(2), or (c)(3).
>
> (5) "Solicit and receive funds" means any written or oral request for

(A) the donation of money, alms, property or anything else of value, or,

(B) the pledge of a future donation of money, alms, property, or anything else of value, or,

(C) the sale or offering for sale of any property upon the representation, express or implied, that the proceeds of such sale will be used for a charitable or religious purpose.

L.A., Cal., Admin. Code § 23.27(c) (1997).

As section 23.27(c)'s text makes clear, persons are expressly banned from soliciting and receiving funds in three areas of LAX: airport terminals, parking lots, and the sidewalks adjacent to both. This ban, however, applies only to solicitation for the immediate receipt of funds[2] and only when done "in a continuous or repetitive manner." *Id.* § 23.27(c)(4). Though the ordinance allows the "distribution" of literature, including "flyers, brochures, pamphlets, [and] books," *id.*, it bars the "sale" of such literature for the immediate exchange of funds, *id.* § 23.27(c)(5).

---

[2] As noted by the California Supreme Court, Appellees have interpreted section 23.27(c) as prohibiting only solicitation for "the immediate receipt of funds." *Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of L.A.*, 227 P.3d 395, 401 n.6 (Cal. 2010). We accept Appellees' construction of the ordinance and limit our inquiry to whether the ban on "immediate receipt of funds" is permissible.

**B**

Brought to the United States from India in 1965, the Krishna consciousness religion requires adherents to engage in an evangelical practice known as *sankirtan*. Specifically, members of ISKCON must "approach people in public places in order to proselytize, solicit donations, sell and distribute religious literature, and disseminate information about Krishna consciousness programs and activities." This practice has four primary purposes: (1) to spread religious truth; (2) to proselytize and attract new members; (3) to distribute Krishna consciousness literature to as many people as possible; and (4) to generate funds to pay for the costs of the distributed literature and for other religious activities. According to ISKCON, soliciting and receiving funds, whether by sale or donation, is "essential" to the group's financial sustainability.

ISKCON seeks to practice *sankirtan* at LAX, a location it considers "particularly vital." Hoping to expose "people from all over the world" to the teachings of Krishna consciousness, ISKCON wants to practice *sankirtan* in three areas at LAX: (1) the exterior sidewalks adjacent to airport terminals; (2) the arrivals level lobbies; and (3) the non-sterile mezzanine level food court and duty free shopping areas at TBIT. Section 23.27(c) prohibits ISKCON from doing so.

On May 13, 1997—two days before section 23.27(c) entered into force—ISKCON filed a complaint in federal court for injunctive and declaratory relief, arguing that the ordinance violated, inter alia, the Liberty of Speech Clause of the California Constitution and the First Amendment to the U.S. Constitution. On May 27, 1998, the district court granted summary judgment in ISKCON's favor on state law

grounds and permanently enjoined section 23.27(c)'s enforcement. The City appealed.

While that appeal was pending, the California Supreme Court held that, for purposes of California law, ordinances "directed at activity involving public solicitation for the immediate donation or payment of funds should not be considered content based" and thus "should be evaluated under the intermediate scrutiny standard applicable to time, place, and manner regulations, rather than under the strict scrutiny standard." *L.A. Alliance for Survival v. City of L.A.*, 993 P.2d 334, 335–36 (Cal. 2000). As a result, we vacated the district court's grant of summary judgment and remanded the case for reconsideration in light of the California Supreme Court's decision. *See* Order, *Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of L.A.*, No. 98-56215 (9th Cir. June 28, 2000).

On remand, the district court again granted summary judgment in favor of ISKCON. *See Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of L.A.*, No. CV97-03616 CBM(VAPX), 2001 WL 1804795 (C.D. Cal. Aug. 2, 2001). Again, the district court did so on state constitutional grounds. *Id.* at *7.

While the City's ensuing appeal was pending, section 171.07 of the Los Angeles Municipal Code—a provisional ordinance that allowed groups, including ISKCON, to obtain permits to solicit and receive funds in designated areas within airport terminals only—was enacted. On January 13, 2003, ISKCON filed a separate suit challenging the new law. This time the district court granted summary judgment in the City's favor, ruling on September 18, 2006, that the

permitting provision did not run afoul of the First Amendment. ISKCON appealed.[3]

On June 9, 2008, this court, having previously remanded this case so the parties could prepare a post-9/11 record, *see Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of L.A.*, 59 F. App'x 974, 975–76 (9th Cir. 2003), issued an order certifying to the California Supreme Court the question whether LAX is a public forum under the California Constitution, *see Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of L.A.*, 530 F.3d 768, 770 (9th Cir. 2008).

On March 25, 2010, the California Supreme Court declined to decide that question, holding instead that even if LAX were a public forum under California law, section 23.27(c) was "valid as a reasonable time, place, and manner restriction of expressive rights." *Int'l Soc'y for Krishna Consciousness of Cal.*, 227 P.3d at 397. Applying California's version of "intermediate scrutiny," the court held that section 23.27(c) was narrowly tailored to the significant government interests of protecting against fraud, duress, and congestion, while leaving open ample alternative means for ISKCON to convey its message. *Id.* at 402–04.

With the state constitutional claim decided, we "dissolve[d] the injunction" barring enforcement of section 23.27(c) and remanded once more for the district court to consider ISKCON's First Amendment challenge. *See Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of L.A.*,

---

[3] The panel assigned to hear ISKCON's separate challenge to section 171.07 is withholding submission pending final resolution of the instant appeal. *See* Order, *Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of L.A.*, No. 06-56660 (9th Cir. Apr. 16, 2014).

386 F. App'x 669, 670 (9th Cir. 2010). In the absence of an injunction, the City began enforcing section 23.27(c)'s solicitation ban on September 15, 2010.

On remand, the district court granted the City's motion for summary judgment and denied ISKCON's. In its order dated August 7, 2012, the court below held that section 23.27(c) was a reasonable, viewpoint-neutral restriction on expressive activity at LAX, a nonpublic forum under the First Amendment. Persuaded by the City's proffered interests in reducing fraud, congestion, passenger-solicitor conflicts, and police distraction, the district court concluded that ISKCON had failed to "create a genuine issue of material fact as to whether the restriction reasonably fulfills a legitimate need."

This appeal followed.

## II

In evaluating the district court's grant of summary judgment dismissing ISKCON's First Amendment claim, "[w]e must determine, viewing the evidence in the light most favorable to the nonmoving party, whether there are any genuine issues of material fact and whether the district court correctly applied the relevant substantive law." *Dietrich v. John Ascuaga's Nugget*, 548 F.3d 892, 896 (9th Cir. 2008) (internal quotation marks omitted). Our review is de novo. *Id.*

All that is left for us to decide is whether section 23.27(c) constitutes a reasonable restriction on protected speech under the First Amendment. We hold that it does.

**A**

We adhere to "a forum based approach for assessing restrictions that the government seeks to place on the use of its property." *Int'l Soc'y for Krishna Consciousness, Inc. v. Lee* (*Lee I*), 505 U.S. 672, 678 (1992) (internal quotation marks omitted). Under this approach, the government in public fora may impose reasonable, content-neutral restrictions on the time, place, or manner of protected speech so long as those limits are "narrowly tailored to serve a significant governmental interest" and "leave open ample alternative channels for communication of the information." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted). This test embodies "an intermediate level of scrutiny." *Berger v. City of Seattle*, 569 F.3d 1029, 1059 (9th Cir. 2009) (en banc).

In nonpublic fora, by contrast, restrictions on speech need "survive only a much more limited review." *Lee I*, 505 U.S. at 679. Specifically, the challenged restriction must be "reasonable in light of the purpose served by the forum" and "viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). The restriction "need not be the most reasonable or the only reasonable limitation"; it "need only be *reasonable*." *Id.* at 808. A restriction is "reasonable," moreover, where it is "wholly consistent with the [government's] legitimate interest in preserv[ing] the property . . . for the use to which it is lawfully dedicated." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 50-51 (1983) (second alteration in original) (internal quotation marks omitted). The reasonableness inquiry, we have noted, "is a deferential one." *Brown v. Cal. Dep't of Transp.*, 321 F.3d 1217, 1223 (9th Cir. 2003).

Here, the parties agree that LAX (its sidewalks included) is a nonpublic forum and that section 23.27(c) is viewpoint neutral. The parties also agree that the "basic purpose" of LAX is "to facilitate, process and serve the traveling public in getting to and from airline flights and moving into and out of the airport terminal areas in a safe, secure, convenient, and efficient fashion." What the parties dispute is whether section 23.27(c) constitutes a reasonable restriction on speech in light of that purpose.

**B**

**1**

Without question, solicitation of funds "is a form of speech protected under the First Amendment." *Lee I*, 505 U.S. at 677. The Supreme Court, however, has traditionally afforded solicitation less protection than other forms of speech. *Compare Lee v. Int'l Soc'y for Krishna Consciousness, Inc.* (*Lee II*), 505 U.S. 830, 831 (1992) (per curiam) (invalidating the Port Authority's ban on literature distribution in New York City's airport terminals), *with Lee I*, 505 U.S. at 683–85 (upholding the Port Authority's ban on solicitation in New York City's airport terminals), *United States v. Kokinda*, 497 U.S. 720, 733–37 (1990) (plurality opinion) (upholding a federal regulation banning solicitation on U.S. Post Office premises, including adjacent sidewalks), *and Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 654–56 (1981) (upholding a rule restricting solicitation to designated booths within the Minnesota State Fair grounds). This is so, the Court has said, because of "the disruptive effect that solicitation may have." *Lee I*, 505 U.S. at 683; *see also Kokinda*, 497 U.S. at 736 (explaining that

"solicitation is inherently more disruptive than . . . other speech activities").

The Court in *Lee I*, faced with a challenge similar to the one at bar, identified two chief consequences of the disruption wrought by solicitation: pedestrian congestion and fraud. Concerning the former, the Court stated:

> Solicitation requires action by those who would respond: The individual solicited must decide whether or not to contribute (which itself might involve reading the solicitor's literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card. Passengers who wish to avoid the solicitor may have to alter their paths, slowing both themselves and those around them. The result is that the normal flow of traffic is impeded.

*Lee I*, 505 U.S. at 683–84 (citations and internal quotation marks omitted). Appellees' interest in "maintain[ing] the orderly movement of the crowd"—i.e., controlling pedestrian congestion—is therefore a "substantial" one. *Heffron*, 452 U.S. at 649-50.

In the context of major international airports, concerns over congestion are even more acute. Writing nearly a decade before 9/11, the Court in *Lee I* observed that solicitation at airports was "especially" problematic because passengers "are often weighted down by cumbersome baggage [and] may be hurrying to catch a plane or to arrange ground transportation." 505 U.S. at 684 (internal quotation

marks omitted). "Delays," continued the Court, "may be particularly costly in this setting, as a flight missed by only a few minutes can result in hours worth of subsequent inconvenience." *Id.*

With the security protocols that airports and the TSA have implemented since 9/11, these worries have only magnified. Quite apart from any security concerns posed by solicitors, the reality is that air travel in the United States has changed dramatically since 1992, when *Lee I* was decided. At LAX, for example, the maximum terminal space available to the general public today is roughly five percent of what it was prior to 9/11. The disruptive effect of solicitation has been amplified accordingly, as airport travelers must now spend more time in less space.

In addition to congestion concerns, airports also possess a "legitimate interest" in protecting travelers from the risk of "fraud" and "duress" attendant to "face-to-face solicitation." *Lee I*, 505 U.S. at 684; *see also Heffron*, 452 U.S. at 657 (Brennan, J., concurring in part and dissenting in part) (expressing "no doubt that the State has a significant interest in protecting its fairgoers from fraudulent or deceptive solicitation practices"). As the Court in *Lee I* explained:

> The skillful, and unprincipled, solicitor can target the most vulnerable, including those accompanying children or those suffering physical impairment and who cannot easily avoid the solicitation. The unsavory solicitor can also commit fraud through concealment of his affiliation or through deliberate efforts to shortchange those who agree to purchase. Compounding this problem is the fact that, in

an airport, the targets of such activity frequently are on tight schedules. This in turn makes such visitors unlikely to stop and formally complain to airport authorities. As a result, the airport faces considerable difficulty in achieving its legitimate interest in monitoring solicitation activity to assure that travelers are not interfered with unduly.

505 U.S. at 684 (citations omitted). Justice Kennedy, concurring in *Lee I*, agreed: "In-person solicitation of funds, when combined with immediate receipt of that money, creates a risk of fraud and duress that is well recognized." *Id.* at 705 (Kennedy, J., concurring in the judgments).

### 2

The twin government interests of reducing congestion and fraud at airports are at least as pressing here as they were in *Lee I*.

As to passenger congestion, Appellees have provided ample, unrefuted testimony indicating that LAX is a venue whose inherent crowdedness solicitors only exacerbate. For instance, Dr. Evert Meyer, director of modeling simulation and operational planning at an airport consultancy, stated in his declaration that "to provide the traveling public with a safe environment and safe access to air travel at LAX, it is imperative that congestion in the terminal lobbies and curbside be reduced to the greatest extent possible." Meyer Decl. ¶ 4. "[A]ny persons who solicit and receive funds in the terminals at LAX," declared Dr. Meyer, "have a detrimental effect on congestion and passenger flow." *Id.* The record is also littered with declarations from persons

working at LAX who attest to the solicitors' adverse impact on airport congestion. This concern peaks at TBIT, typically LAX's most crowded terminal.

ISKCON, for its part, has failed to raise a genuine issue of material fact on this score. Indeed, one of ISKCON's aviation experts acknowledged that "LAX by its very nature is a congested area." Elson Decl. ¶ 19. Furthermore, that expert's opinion that airport solicitors "do not present a meaningful increase in congestion" is fatally undercut by his exclusive focus on the impact of just a "handful of solicitors," *id.* ¶¶ 32-33, rather than on the entire population of likely solicitors. This oversight dooms his conclusion. *See Lee I*, 505 U.S. at 685 ("[T]he justification for the Rule should not be measured by the disorder that would result from granting an exemption solely to ISKCON. For if ISKCON is given access, so too must other groups." (citation and internal quotation marks omitted)); *Heffron*, 452 U.S. at 654 ("[T]he inquiry must involve not only ISKCON, but also all other organizations that would be entitled to distribute, sell, or solicit if the booth rule may not be enforced with respect to ISKCON."). And even if the solicitor population as a whole contributed only marginally to the existing congestion at LAX's terminals and sidewalks, Appellees "could reasonably worry that even such incremental effects would prove quite disruptive." *Lee I*, 505 U.S. at 685.

As to fraud and duress, Appellees have provided unrebutted testimony that repetitive, in-person solicitation at LAX presents a legitimate risk of deceit. For example, Laponda Fitchpatrick, an airport police captain, declared that solicitors often run a familiar scheme: they will pose as "Airport Ambassadors," purport to provide information (correct, or not) to travelers, reveal later that they are also

soliciting funds for a particular cause, and collect money from the travelers who typically "feel obligated to provide the solicitor with a donation because of the circumstances." Fitchpatrick Decl. ¶ 19. Myriad other examples of solicitor fraud dot the record: solicitors using badges to deceive travelers; solicitors pretending to work for disaster relief organizations; and solicitors posing as City employees to bilk travelers. According to eyewitness declarations, ISKCON solicitors are themselves not exempt from practicing chicanery. The risk of fraud is particularly severe at TBIT, where a larger portion of travelers struggle with English.

Once again, ISKCON has not shown a genuine issue of material fact. Rather than disputing Appellees' factual allegations, ISKCON argues instead that any fraud or duress can be prevented through enforcement of existing laws. But as the Court in *Lee I* explained, air travelers "on tight schedules" are "unlikely to stop and formally complain" of fraud to airport officials. 505 U.S. at 684. International travelers may be even less inclined, especially if there is a language barrier or they lack the time to complain until their arrival in a faraway land. Considering the strong likelihood of underreporting, Appellees could reasonably conclude that the enforcement of existing laws would be an inadequate means of regulating solicitor fraud.

In short, ISKCON has not raised a genuine issue of material fact as to either of these legitimate interests. Nor has ISKCON shown that the challenged ordinance is an otherwise unreasonable means of effectuating those interests. Section 23.27(c), like the regulation upheld in *Lee I*, is actually quite limited: it bars only solicitation for the immediate receipt of funds and only if done in a continuous or repetitive manner. *See* L.A., Cal., Admin. Code § 23.27(c)(4) (1997); *see also*

*Lee I*, 505 U.S. at 707 (Kennedy, J., concurring in the judgments) ("[T]he solicitation ban survives with ease, because it prohibits only solicitation of money for immediate receipt. . . . And in fact, the regulation is even more narrow because it only prohibits such behavior if conducted in a continuous or repetitive manner."). It surprises us little, then, that the California Supreme Court, applying the state's form of intermediate scrutiny, concluded that the ordinance was "a narrowly tailored regulation of expressive activity." *Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of L.A.*, 227 P.3d 395, 403 (Cal. 2010).

Unlike intermediate scrutiny, moreover, reasonableness review does not require Appellees to show that section 23.27(c) leaves open ample alternative channels for ISKCON to raise money. *See Lee I*, 505 U.S. at 683–85 (failing to mention any such requirement under reasonableness review); *id.* at 683 (reiterating that the challenged regulation "need only be *reasonable*; it need not be the most reasonable or the only reasonable limitation" (internal quotation marks omitted)). The ordinance does so anyway. Indeed, section 23.27(c) permits numerous other forms of communication: it allows ISKCON to solicit future donations online or via preaddressed envelopes, to distribute Krishna consciousness literature, and to spread its word to willing passersby. *See id.* at 707-08 (Kennedy, J., concurring in the judgments).

ISKCON, in response, argues that subsisting on donations via preaddressed envelopes would be financially ruinous. In the group's experience, only about ten percent of those solicited for future donations actually give. Even so, the First Amendment does not guarantee ISKCON its preferred method of solicitation. In *ACORN v. City of Phoenix*, 798 F.2d 1260, 1271 (9th Cir. 1986), *overruled on other*

*grounds by Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011) (en banc), this court rejected another group's contention that soliciting vehicle occupants was "a uniquely effective method of fundraising for the organization, for which no significant alternative approach exists." Though applying the more stringent test for restrictions in a public forum, this court explained that "the myriad and diverse methods of fundraising available in this country, including solicitation on the sidewalk from pedestrians, canvassing door-to-door, telephone campaigns, or direct mail," meant that the group was not "left without ample alternatives by the mere foreclosure of one questionable approach to soliciting contributions." *Id.*

Same here. While ISKCON might justifiably prefer to obtain money from travelers on the spot, nothing prevents the group from raising money in countless other ways at countless other venues. In this case, the First Amendment demands no more.

Lastly, ISKCON argues that *Lee I* requires airport sidewalks to remain open for solicitation. It does no such thing. True enough, the ban in *Lee I* reached only solicitation within airport terminal buildings. *See* 505 U.S. at 676. In assessing the regulation's reasonableness, moreover, the Court was heartened because ISKCON members could still solicit funds on "the sidewalk areas outside the terminals," ensuring that their access to "an overwhelming percentage of airport users" would be "quite complete." *Id.* at 684-85. But nowhere in the opinion did the Court suggest that the regulation would have been unconstitutional had it also barred solicitation on the sidewalks. The Justices had no occasion to address this hypothetical. The Court simply

found that the solicitors' continued access to the airport sidewalks was but one factor weighing in favor of reasonableness. *See ISKCON Miami, Inc. v. Metro. Dade Cnty.*, 147 F.3d 1282, 1289–90 (11th Cir. 1998) (interpreting *Lee I* as such and finding a solicitation ban that extended to Miami International Airport's sidewalks reasonable in light of their "particularly hectic nature").

In all events, Appellees' interest in reducing congestion is only heightened along LAX's narrow, oft-crowded sidewalks, which span but twelve feet in certain areas. Furthermore, Appellees' interest in protecting against fraud and duress is just as strong on the sidewalks as it is inside the terminals. ISKCON does not contend otherwise.

We therefore find that section 23.27(c) reasonably furthers Appellees' legitimate interests in reducing congestion and fraud at LAX. Under the deferential standard we apply to content-neutral restrictions in nonpublic fora, Appellees prevail.

**3**

We note our agreement with the Eleventh Circuit. In *ISKCON Miami, Inc. v. Metropolitan Dade County*, 147 F.3d 1282 (11th Cir. 1998), that court ruled on a remarkably similar challenge. There, as here, the Krishnas sought to enjoin a major international airport's ban on the solicitation of funds and sale of literature.**⁴** *Id.* at 1284. There, as here,

---

**⁴** Section 23.27(c), like the regulation in *ISKCON Miami*, also bans the sale of literature for the immediate exchange of funds. *See* L.A., Cal., Admin. Code § 23.27(c)(4)–(5) (1997). Although "no majority of the [*Lee I* or *II*] court directly addressed the [Port Authority's] ban on the sale

the ban extended beyond just the terminal buildings to the parking lots and sidewalks. *Id.* at 1285. And there, as here, the Krishnas were free to solicit future donations because the ban was limited to "solicitation and sales followed by the immediate receipt of funds." *Id.* at 1290.

Affirming the district court's grant of summary judgment for Dade County, the Eleventh Circuit unanimously held that the ban was "a reasonable restriction on speech" in "a nonpublic forum." *Id.* at 1288. Though sitting three years before 9/11, the court in *ISKCON Miami* concluded nonetheless that the ban was justified in light of Dade County's "valid" interests in reducing airport "delays and disruptions" and protecting against "fraud and coercion." *Id.* The court so held even though the ban also restricted the locations where persons could distribute free literature to just "eight areas in the airport." *Id.* at 1290. Section 23.27(c) contains no such restriction.

---

of literature," *ISKCON Miami*, 147 F.3d at 1286, we agree with the Eleventh Circuit that the "same problems" justifying government restrictions on solicitation in a nonpublic forum justify those same restrictions on the sale of literature, *id.* at 1287. As with solicitation, the sale of literature "requires action by those who would respond." *Lee I*, 505 U.S. at 683 (internal quotation marks omitted). "The individual [purchaser]," like his solicited counterpart, "must decide whether or not to contribute (which itself might involve reading the [seller's] literature or hearing his pitch), and then, having decided to do so, reach for a wallet, search it for money, write a check, or produce a credit card." *Id.* (internal quotation marks omitted). Ultimately, the result is the same: "the normal flow of traffic is impeded." *Id.* at 684. Appellees' "substantial" interest in "maintain[ing] the orderly movement of the crowd" at LAX is no weaker because peripatetic sellers, rather than solicitors, have caused the disruption. *Heffron*, 452 U.S. at 649-50.

The Fourth Circuit's more recent decision in *The News & Observer Publishing Co. v. Raleigh-Durham Airport Authority*, 597 F.3d 570 (4th Cir. 2010), in no way alters our conclusion. There, the court invalidated Raleigh-Durham International Airport's total ban on newspaper racks inside its terminals. *Id.* at 581. In so doing, the court found that the newspaper racks "would create only trivial congestion." *Id.* at 580. The record here, by contrast, establishes that solicitors at LAX have a substantial adverse impact on congestion. In addition, the Fourth Circuit did not address concerns regarding fraud and duress. How could it? Inanimate newspaper racks do not pose a risk of deceitful behavior similar to that posed by face-to-face solicitors. Unlike LAX's solicitors, newspaper racks cannot "target the most vulnerable," nor are they likely to conceal their affiliation. *Lee I*, 505 U.S. at 684. Accordingly, the Fourth Circuit's decision does not persuade us.

\* \* \*

Major international airports have a legitimate interest in controlling pedestrian congestion and reducing the risk of fraud and duress attendant to repetitive, in-person solicitation for the immediate receipt of funds. As section 23.27(c) is limited in nature and leaves open alternative channels for ISKCON to raise money, we hold that this ordinance acts as a reasonable restriction on protected speech under the First Amendment.

**AFFIRMED.**