**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LEESA JACOBSON; PETER RAGAN, *Plaintiffs-Appellants*, <br><br> v. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY; UNITED STATES CUSTOMS AND BORDER PROTECTION; UNITED STATES OFFICE OF BORDER PATROL; KIRSTJEN M. NIELSEN, Acting Secretary, United States Department of Homeland Security, in her official capacity; KEVIN K. MCALEENAN, Acting Commissioner, United States Customs & Border Protection, in his official capacity; CARLA L. PROVOST, Acting Chief of the United States Border Patrol, in her official capacity; JEFFREY SELF, Commander, Arizona Joint Field Command, in his official capacity; MANUEL PADILLA, JR., Chief Patrol Agent-Tucson Sector, in his official capacity; ROGER SAN-MARTIN, Agent in Charge-Tucson Border Patrol Station, in his official capacity; LLOYD EASTERLING, Assistant Agent in Charge-Tucson | No. 16-17199 <br><br> D.C. No. 4:14-cv-02485-BGM <br><br><br> OPINION |

Border Patrol Station, in his official
capacity; J. JOYNER, Border Patrol
Agent, in his official capacity;
ROSALINDA HUEY, Border Patrol
Agent, in her official capacity; N.
BALLISTREA, Border Patrol Agent, in
her official capacity; S. SPENCER,
Border Patrol Agent, in his official
capacity; K. RIDEN, Border Patrol
Agent, in her official capacity,
                 *Defendants-Appellees.*

Appeal from the United States District Court
for the District of Arizona
Bruce G. Macdonald, Magistrate Judge, Presiding

Argued and Submitted December 5, 2017
San Francisco, California

Filed February 13, 2018

Before:  MILAN D. SMITH, JR., and SANDRA S.
IKUTA, Circuit Judges, and JOHN D. BATES,[*]
District Judge.

Opinion by Judge Milan D. Smith, Jr.

[*] The Honorable John D. Bates, Senior District Judge for the United
States District Court for the District of Columbia, sitting by designation.

# SUMMARY**

## Civil Rights

The panel vacated the district court's summary judgment, entered before any discovery occurred, and remanded in an action in which appellants challenged their exclusion from an enforcement zone set up around a Border Patrol checkpoint area near their homes in rural Arizona.

Appellants alleged that the First Amendment afforded them the right both to protest and to monitor the activities at the Border Patrol checkpoint, which they contend include racial profiling and other abuses. The district court determined that the checkpoint area, including the enforcement zone, was a nonpublic forum from which the government could reasonably exclude appellants. The district court therefore denied the motion to take discovery pursuant to Federal Rule of Civil Procedure 56(d), on the ground that the information would not assist appellants in opposing summary judgment.

The panel held that appellants identified several areas where discovery was relevant to critical matters at issue in the summary judgment motion. First, information regarding law enforcement uses of the checkpoint area encompassed within the enforcement zone was relevant to the determination of whether the enforcement zone was a public or a nonpublic forum. Second, information about who had been allowed into the enforcement zone could reveal

---

** This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

whether the enforcement zone has been applied selectively based on viewpoint. Finally, information regarding traffic stops at the checkpoint was relevant to determine the accuracy of data gathered by appellants and their alternative opportunities for observation, as would be required to justify their exclusion from a public forum.

The panel held that the limited record before the district court did not permit it to conclude, as a matter of law, that the enforcement zone was a nonpublic forum, or, if it was, whether the government satisfied the requirements for excluding appellants from that nonpublic forum. On remand, and after appropriate discovery, the panel held that the district court will need to determine if there remain genuine issues of material fact regarding whether, and what part of, the enforcement zone is a public forum, and whether the government's exclusion policy is permissible under the principles of forum analysis.

## COUNSEL

Winslow Taub (argued), Tracy Zinsou, Ethan Forrest, and Neha Jaganathan, Covington & Burling LLP, San Francisco, California; Kathleen E. Brody and Brenda Muñoz Furnish, ACLU Foundation of Arizona, Phoenix, Arizona; Mitra Ebadolahi and David Loy, ACLU Foundation of San Diego & Imperial Counties, San Diego, California; for Plaintiffs-Appellants.

Patrick G. Nemeroff (argued) and Scott McIntosh, Appellate Staff; Elizabeth A. Strange, Acting United States Attorney; Chad A. Readler, Acting Assistant Attorney General; Civil Division, United States Department of Justice, Washington, D.C.; for Defendants-Appellees.

Eugene Volokh, Scott & Cyan Banister First Amendment Clinic, UCLA School of Law, Los Angeles, California; Ilya Shapiro, Cato Institute, Washington, D.C.; for Amicus Curiae The Cato Institute.

Rochelle L. Wilcox, Taylor S. Ball, and John Parsi, Davis Wright Tremaine LLP, Los Angeles, California, for Amici Curiae National Press Photographers Association and The Center for Investigative Reporting Inc.

**OPINION**

M. SMITH, Circuit Judge:

Leesa Jacobson and Peter Ragan (collectively, Appellants) filed this suit to challenge their exclusion from an enforcement zone set up around a Border Patrol checkpoint area near their homes in rural Arizona. Before any discovery occurred, the district court granted summary judgment to the Defendants-Appellees (Appellees). We vacate and remand for further proceedings.

**FACTUAL AND PROCEDURAL BACKGROUND**

Since 2007, the United States Border Patrol (BP) has operated a checkpoint on Arivaca Road, a rural two-lane road in southern Arizona. The checkpoint includes a primary inspection area located on Arivaca Road itself, and a secondary inspection area located on the south side of Arivaca Road. Eastbound motorists are stopped and questioned at the primary inspection area and, in some cases, directed to the secondary inspection area for further questioning. The improvements in the checkpoint area include two portable restrooms, a portable office unit made

of storage containers, a portable kennel, several portable lights, and road signs, all located on the south side of Arivaca Road.

Residents of nearby towns such as the Appellants must pass through the checkpoint on their daily routines and stop when traveling eastbound. Some of them, as part of an organization called People Helping People (PHP), held a protest near the checkpoint area on December 8, 2013. The protest was spurred by community complaints that BP agents racially profiled, unlawfully searched, and used excessive force on people stopped at the checkpoint. The BP agent in charge of the checkpoint area learned of the planned protest and decided to suspend checkpoint operations during the protest, allegedly for the safety of all involved, which permitted cars to pass uninspected. On February 26, 2014, the Appellants and others returned to the checkpoint area to protest and to monitor activities within the checkpoint area. The protesters stood first on the south side of Arivaca Road, and later on the north side of the road, in each case approximately 100 feet east of the portable office. After the protesters refused to move further away from the checkpoint area, BP agents erected a yellow tape barrier across the north and south shoulders of Arivaca Road approximately 150 feet east of the portable office unit, and required the protesters to relocate behind those barriers.

During the following week, the tape barrier was replaced with rope barriers on both ends, and signs were added forbidding unauthorized entry. The rope barriers and the signs remain in place approximately 150 feet east and west of the portable office unit. Protesters who have attempted to cross the rope barriers have been threatened with arrest and forced back behind those barriers. In total, the so-called

enforcement zone of the checkpoint area extends for approximately 391 feet along Arivaca Road.

Several incidents led Appellants to believe that the enforcement zone policy was selectively enforced against them. The agents in charge stated in an email to Appellants and at a public presentation that agents on the scene are the ones who determine "who can enter into the perimeter" and "where [Appellants] can and can't be." On April 3, 2014, one of the Appellants saw a local resident arrive at the checkpoint area, park inside the enforcement zone, and remain inside the barrier for approximately 40 minutes. The local resident's wife also arrived and parked inside the barrier. The local resident, who was known to be a supporter of the BP and an opponent of PHP, questioned and harassed the PHP protesters. BP agents did not ask the local resident to leave the enforcement area. As he departed, he shouted "Well, we had our fun today" to the BP agents on duty, who smiled and laughed. When the Appellants asked an agent at the checkpoint area if they had given the local residents permission to be in the enforcement zone, the agent replied, "It's a free country." When the agent in charge learned of this incident from Appellants' counsel on April 16, 2014, he directed watch commanders to discuss the incident with checkpoint agents and make clear that what had been done was unacceptable.

Subsequently, a surveyor hired by Appellants was allowed inside the enforcement zone. The agents on duty explained to the surveyor that "the barriers were in place only to exclude people who might interfere with Border Patrol activities, such as protestors." One agent invited the surveyor to share a meal with the agents on duty. On another occasion, BP agents allowed reporters and pedestrians to walk along the north side of the road through the

enforcement zone during a PHP rally; but, on the same day, agents parked their vehicles so as to impede the PHP monitors from even viewing, much less entering, the enforcement zone.

Appellants filed suit on November 20, 2014, alleging unlawful infringement of their First Amendment rights and retaliation for exercise of those rights. The complaint sought injunctive and declaratory relief as well as costs and attorney's fees. After the district court denied Appellants' motion for a preliminary injunction, Appellees moved to dismiss or, in the alternative, for summary judgment. Appellants opposed this motion and moved for discovery. Based only on the pleadings and declarations, and before any discovery had taken place, the district court denied Appellees' motion to dismiss, denied Appellants' motion to take discovery, and granted summary judgment to Appellees on the ground that the checkpoint area, including the enforcement zone, is a nonpublic forum, and that the restrictions on speech therein are content-neutral and reasonable. Appellants timely appealed.

## ANALYSIS

Appellants maintain that the First Amendment affords them the right both to protest and to monitor the activities at the BP checkpoint, which they contend include racial profiling and other abuses. *See Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203 (9th Cir. 2018) ("It is no surprise that we have recognized that there is a 'First Amendment right to film matters of public interest.'" (quoting *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995))). They argue that the district court erred in concluding as a matter of law that the government may exclude them from the entire enforcement zone, and that it abused its discretion by denying their motion for discovery.

We examine these questions within the framework of forum analysis, in which the level of judicial scrutiny depends upon whether the site is properly categorized as a public forum or a nonpublic forum. *See Int'l Soc'y for Krishna Consciousness of Cal., Inc. v. City of Los Angeles*, 764 F.3d 1044, 1049 (9th Cir. 2014). In a public forum, the government "may impose reasonable, content-neutral restrictions on the time, place, or manner of protected speech so long as those limits are 'narrowly tailored to serve a significant governmental interest' and 'leave open ample alternative channels for communication of the information.'" *Id.* (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). We have referred to this test as "an intermediate level of scrutiny." *Id.* (quoting *Berger v. City of Seattle*, 569 F.3d 1029, 1059 (9th Cir. 2009) (en banc)). In a nonpublic forum, restrictions on speech must only be "'reasonable in light of the purpose served by the forum' and 'viewpoint neutral.'" *Id.* (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985)).

The enforcement zone, consisting of strips of public land along a public roadway, may have begun as a public forum. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 945 (9th Cir. 2011) ("Public streets and sidewalks 'occupy a "special position in terms of First Amendment protection."' They are 'the archetype of a traditional public forum.'" (alteration and citations omitted) (quoting *Snyder v. Phelps*, 562 U.S. 443, 456 (2011))); *see also Long Beach Area Peace Network v. City of Long Beach*, 574 F.3d 1011, 1022 (9th Cir. 2009). Since 2007, it has also

served as, or abutted, a BP checkpoint.[1] One question before us is whether this new use has changed the enforcement zone's character from a public forum to a nonpublic forum. "Although it is possible for a public forum to lose its status, 'the destruction of public forum status . . . is at least presumptively impermissible.'" *ACLU of Nev. v. City of Las Vegas*, 333 F.3d 1092, 1105 (9th Cir. 2003) (alteration in original) (quoting *United States v. Grace*, 461 U.S. 171, 180 (1983)).    Therefore, the government bears the burden of showing that an area previously serving as a rural public road "is no longer a [rural public road] and has lost its public forum status." *Id.* "In order to change a property's public forum status, the [government] 'must alter the objective physical character or uses of the property.'" *Id.* (quoting *Int'l Soc'y for Krishna Consciousness v. Lee*, 505 U.S. 672, 700 (1991) (Kennedy, J., concurring)); *cf. Hale v. Dep't of Energy*, 806 F.2d 910, 915 (9th Cir. 1986) (holding that an access road was a nonpublic forum because it had been "withdrawn from public use for the purpose of conducting nuclear testing").

This inquiry is, to a large extent, factual.    "Context matters in forum analysis." *Wright v. Incline Vill. Gen. Improvement Dist.*, 665 F.3d 1128, 1136 (9th Cir. 2011). This circuit has developed a fact-intensive, three-factor test

---

[1] The parties dispute whether all of the enforcement zone is part of the checkpoint area: the government maintains that the "checkpoint" is the entire enforcement zone, while Appellants argue that the "checkpoint" is only the actual structures and areas used for law enforcement activities, such as the portable office and the secondary inspection area, and the enforcement zone stretches far beyond the checkpoint.  To the extent this is a question of semantics, we may disregard it; to the extent it is a factual question with any legal relevance, there is a genuine issue of material fact which must be resolved in favor of the nonmoving party on a motion for summary judgment.

to determine whether a location is a public forum in the first instance. *See ACLU of Nev.*, 333 F.3d at 1100–01. Determining whether the government has "alter[ed] the objective physical character or uses of [a] property" that was previously a public forum, *id.* at 1105 (citation omitted), is likewise fact-specific, *see, e.g., id.* ("The principal uses of Fremont Street, both before and after its transformation, are as a commercial district and public thoroughfare."); *Venetian Casino Resort, LLC v. Local Joint Exec. Bd. of Las Vegas*, 257 F.3d 937, 944 (9th Cir. 2001) ("The newly constructed sidewalk still performs the same role as a thoroughfare for pedestrian traffic along Las Vegas Boulevard that it performed before . . . ."). Therefore, it may be difficult to make a forum determination without a full factual record. *See Kaahumanu v. Hawaii*, 682 F.3d 789, 800 (9th Cir. 2012) ("On the record before us, it is difficult to put all of Hawai'i's unencumbered state beaches into a single forum category."); *Ctr. for Bio-Ethical Reform, Inc. v. City & Cty. of Honolulu*, 455 F.3d 910, 920 (9th Cir. 2006) ("We do not express any opinion as to whether the beaches are public fora because the record is not developed on this point . . . ."); *Preminger v. Principi*, 422 F.3d 815, 823 n.5 (9th Cir. 2005) ("Plaintiffs' mere mention of the parks and streets on the Campus, areas generally considered traditional public fora, is insufficient for us to classify them because the preliminary injunction record contains insufficient detail."). It is all the more difficult in a case like this one, in which the facts in the record are at times contradictory and contested by the parties.

Appellants argue that the district court could not resolve this factual dispute on the record before it, and hence abused its discretion by denying their request to take discovery pursuant to Federal Rule of Civil Procedure 56(d). We agree. "Where . . . a summary judgment motion is filed so

early in the litigation, before a party has had any realistic opportunity to pursue discovery relating to its theory of the case, district courts should grant any Rule 56[(d)] motion fairly freely." *Burlington N. Santa Fe R.R. Co. v. Assiniboine & Sioux Tribes of Fort Peck Reservation*, 323 F.3d 767, 773 (9th Cir. 2003).

The district court denied the Rule 56(d) motion on the ground that the information sought "would not assist [Appellants] in opposing summary judgment regarding whether the checkpoint is a non-public forum." However, Appellants identified several areas in which they sought discovery relevant to critical matters at issue in the summary judgment motion.

First, Appellants sought discovery regarding the law enforcement uses of the checkpoint area encompassed within the enforcement zone, including rules and regulations governing the use of the checkpoint area. These uses are relevant to the determination of whether the enforcement zone is a public or a nonpublic forum. Moreover, regardless of which level of scrutiny applies, they may be relevant to the ultimate constitutional question of whether the enforcement zone policy violates the First Amendment. The limited information in the record regarding the layout and use of the checkpoint area leaves many questions unanswered about the specific uses of areas outside the primary and secondary inspection zones. For example, evidence that large portions of the enforcement zone are unused for checkpoint activities would tend to create genuine issues of material fact as to whether the government has transformed the enforcement zone along Arivaca Road into a nonpublic forum and, if the area is still a public forum, whether the enforcement zone is narrowly tailored to the government's interest in operating a BP checkpoint. *See*

*Long Beach Area Peace Network*, 574 F.3d at 1039–40; *Bay Area Peace Navy v. United States*, 914 F.2d 1224, 1228 (9th Cir. 1990).

Second, Appellants sought discovery about who has been allowed into the enforcement zone and why. This information could reveal whether the enforcement zone has been applied selectively based on viewpoint. The government's stated policy is that "pedestrians are allowed inside the checkpoint only for official purposes," but without the benefit of discovery Appellants have already adduced evidence that calls that policy into question. While BP has consistently excluded Appellants and other protesters from the enforcement zone, the record shows that other visitors who were not protesting have been allowed inside. Whether the enforcement zone is a public or a nonpublic forum, evidence that civilians friendly or neutral to BP have been permitted into the enforcement zone while other civilians with a hostile message have been excluded—beyond the incidents already in the record—would tend to create a genuine issue of material fact as to the viewpoint neutrality of the government's policy. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995).

Finally, Appellants sought discovery of data regarding traffic stops at the checkpoint, in order to determine the accuracy of the data gathered by Appellants from their positions outside the enforcement zone. This information is relevant to whether Appellants have ample alternative opportunities for observation, as would be required to justify their exclusion from a public forum. *See Reed v. Lieurance*, 863 F.3d 1196, 1212 (9th Cir. 2017).

The limited record before the district court does not permit us to conclude, as a matter of law, that the enforcement zone is a nonpublic forum, or, if it is, that the

government has satisfied the requirements for excluding Appellants from that nonpublic forum. On remand, and after appropriate discovery, the district court will need to determine if there remain genuine issues of material fact regarding whether, and what part of, the enforcement zone is a public forum, and whether the government's exclusion policy is permissible under the principles of forum analysis.

## CONCLUSION

For the foregoing reasons, we vacate the district court's grant of summary judgment and remand for further proceedings. Costs shall be taxed against Defendants-Appellees.

VACATED and REMANDED.