**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 22-2291**

_____

RAY LEWIS HALE,

Plaintiff - Appellant,

v.

STATE FARM FIRE & CASUALTY CO.,

Defendant - Appellee.

_____

Appeal from the United States District Court for the Western District of Virginia, at Abingdon. James P. Jones, Senior District Judge. (1:21-cv-00049-JPJ-PMS)

_____

Submitted: October 10, 2024                    Decided: January 7, 2025

_____

Before RICHARDSON and HEYTENS, Circuit Judges, and TRAXLER, Senior Circuit Judge.

_____

Vacated and remanded by unpublished per curiam opinion.

_____

**ON BRIEF:** Michael A. Bragg, BRAGG LAW, Abingdon, Virginia, for Appellant. Guy M. Harbert, III, Monica T. Monday, David R. Berry, GENTRY LOCKE, Roanoke, Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

After his house was destroyed by fire in 2018, appellant Ray Hale filed claims for loss of the house and contents with his insurer, respondent State Farm Fire and Casualty Company. State Farm ultimately paid Hale a total of approximately $224,000 for his losses. Hale subsequently filed a breach-of-contract action against State Farm, alleging that the payments he received were insufficient and did not satisfy State Farm's obligations under the policy.[1] The district court granted summary judgment in favor of State Farm, and Hale appeals. We vacate and remand for further proceedings.

I.

The State Farm policy at issue in this case provided fire-loss coverage for Hale's dwelling and personal property. The dwelling is addressed in Coverage A of the policy, and personal property is addressed in Coverage B.

As to the dwelling, the policy provided coverage of approximately $400,000 for "the cost to repair or replace with similar construction and for the same use." J.A. 27.[2] The policy explained, however, that "until actual repair or replacement is completed, we will pay only the actual cash value at the time of the loss." J.A. 27. The policy also provided replacement-cost coverage for personal property located in the dwelling. As with the

---

[1]      Hale filed this action in Virginia state court. Because the parties are diverse, State Farm removed the case to federal court. *See* 28 U.S.C. §§ 1332, 1441.

[2]      The declarations page of the policy shows a coverage limit for the dwelling of $398,200, *see* J.A. 14, which was later adjusted for inflation in accordance with the policy terms, *see* J.A. 23.

dwelling coverage, the policy required that the property actually be repaired or replaced; otherwise, State Farm was obligated to "pay only the cost to repair or replace less depreciation." J.A. 28.

The policy imposes certain duties on the insured, including payment of premiums and prompt notification to State Farm of covered losses. As to claims for loss to personal property, the policy requires the insured to "prepare an inventory of damaged . . . personal property. Show in detail the quantity, description, age, replacement cost and amount of loss. Attach to the inventory all bills, receipts and related documents that substantiate the figures in the inventory." J.A. 29. The policy requires that any lawsuit against it "must be started within two years after the date of loss or damage," and prohibits the insured from commencing an action "unless there has been compliance with the policy provisions." J.A. 30.

## II.

Hale's home in Abingdon, Virginia, was destroyed by fire on November 24, 2018. Hale notified State Farm within hours of the fire. On November 28, State Farm sent Hale a letter explaining the coverage available to him under the policy. Consistent with the terms of the policy, the letter explained that his claims would be paid based on the "actual cash value" of the property and that additional "replacement cost benefits" were available for property that Hale actually repaired or replaced, so long as the repair or replacement was done by November 24, 2020—two years after the fire. J.A. 83, 84. The letter asked Hale to provide an inventory of his personal property losses and include "all bills, receipts and related documents that substantiate [the] inventory." J.A. 84.

3

Robin Dye, Hale's adult daughter, submitted personal property inventories on behalf of her father on three occasions. The first inventory, submitted on November 28, 2018, included more than 200 entries[3] for items with an estimated worth of approximately $181,000. *See* J.A. 86-98; Brief of Respondent at 5. Dye submitted an updated inventory on December 8, 2018, which deleted some items and added a few items that had been omitted from the first. *See* J.A. 99-111. Dye submitted the last inventory on February 8, 2019. That version included 215 entries for items with a total value of approximately $168,000. *See* J.A. 121-33; Brief of Respondent at 5. Dye was able to provide State Farm with some pictures showing the interior of the home and some of its contents. The inventories otherwise included no receipts or other documentation; as Dye explained in an email to State Farm, whatever might have existed was destroyed in the fire. *See* J.A. 99.

Some of the entries in Dye's inventories included fairly specific descriptions of the lost property, but many entries used vague and general terms, with few details to help establish value. For example, entries for items from inside the home include family pictures taken between 1948 and 2018 valued at $5000; $4000 worth of "Willowtree, Home Interior, Crystal, Jesus Figurines, What Nots," J.A. 125; and "Real Crystal and Star of David Items Probably 100 pieces," with an estimated value of $5000, J.A. 125. Entries for outdoor décor items include "Jesus," valued at $500, and "[a]nimals in rocks," valued at $100. J.A. 131. The inventories also included a Rolex watch given to Hale by his brother, who died sometime before the fire. Dye herself had never even seen the watch because

---

[3]    Many of the inventory entries include more than one item.

4

Hale put it away as soon as he received it and never wore it. Dye arrived at the value by showing Hale pictures of Rolex watches until they found one that he believed was similar to his watch. *See* J.A. 193-200. In the first two inventories, Dye valued the Rolex at $50,000. *See* J.A. 97, 110. In the final inventory, she listed its value as $5,000. *See* J.A. 131. Dye explained that the extra zero in the first two inventories was a typo. *See* J.A. 192.

Consistent with its rights under the policy, State Farm interviewed Hale under oath on April 18, 2019. Dye also participated in the interview and agreed to be placed under oath. The interview focused primarily on the accuracy and completeness of the personal property inventory. During the course of the interview, Hale (and Dye) acknowledged that there were errors in the inventory and that some of the valuations were purely speculative. They also indicated that some items had not been included, but Hale said that he was not asking State Farm to pay for those items and declined to supplement the inventory.[4]

After the interview, State Farm had several conversations with Hale's attorney about the claims. On October 9, 2019, State Farm met with Hale's attorney and offered to pay what State Farm believed was the actual cash value of Hale's home and personal property. This offer was formalized in a letter dated October 25, 2019.

---

[4]      In the recorded interview, Dye asked if Hale should submit an updated inventory to include the omitted items. Hale responded, "Just let those things go. A couple thousand dollars, it ain't going to hurt one way or the other." J.A. 201. Counsel for State Farm then explained that if Hale had "additional items of contents" and "wish[ed] to supplement [his] inventory," he could "do so now or . . . at a later date." J.A. 201. Hale responded, "I am okay." J.A. 202. *See also* J.A. 186-87 ("[T]here's things in that house will never be replaced and I ain't going to ask nobody to pay for them.").

Neither Hale nor his attorney responded to State Farm's October 2019 offer, despite multiple follow-up letters and phone calls. *See* J.A. 54-56. In April 2020, State Farm sent Hale's attorney checks for the cash value of the home and personal property: $171,021.59 for the actual cash value of the home and $44,058.89 for the actual cash value of the "undisputed items" of personal property. *See* J.A. 55, 150. State Farm explained that Hale was eligible for an additional $127,307.49 in replacement cost benefits if he repaired or replaced his home, *see* J.A. 158, and an additional $31,765.50 in replacement cost benefits if he repaired or replaced the personal property, *see* J.A. 160, 169. Hale did not communicate with State Farm after receiving the checks. On July 14, 2020, State Farm sent a letter to Hale's attorney explaining that because there had been no activity, Hale's claim was being placed "in an inactive status." J.A. 175.

Hale cashed the $44,058.89 personal-property check in September 2020. His attorney held on to the check for the dwelling while he attempted to reach a settlement with the reverse-mortgage holder. On November 24, 2020—exactly two years after the fire—Hale commenced this litigation by filing a complaint alleging breach of contract. Hale sought $400,000 in damages, alleging that he was entitled to the replacement cost for his house and challenging State Farm's valuation of his personal property. Hale served the complaint on State Farm a year later,[5] and State Farm removed the action to federal court.

---

[5]      *See* Va. Code Ann. § 8.01-275.1 (providing that service of process is timely if completed within 12 months after filing a complaint).

6

In June 2022, State Farm learned through a discovery response that Hale had bought a house jointly with Dye and her husband. The contract for the sale of the house was signed on November 2, 2020, and the sale closed on December 1, 2020.

State Farm moved for summary judgment and supported its motion with the insurance policy and other evidence, including an affidavit from the claims representative who handled the claim; emails and correspondence between the parties; the inventories submitted by Dye in support of Hale's claims; and the transcript of the recorded interview. Hale did not file a response to the motion.

After a hearing, the district court granted State Farm's motion for summary judgment. As to Hale's claim seeking replacement-cost coverage for the house under Coverage A, the district court noted that the policy required State Farm to provide replacement cost coverage only if the repair or replacement of the house was completed within two years after the fire. Because the policy required that any action against it be filed within two years after the date of the loss, the replacement had to be complete before Hale could file suit. The district court therefore concluded that the claim was barred by the terms of the policy because the fire occurred on November 24, 2018, but Hale did not buy a new house until December 1, 2020, more than two years later.

As to Hale's challenge to the amount paid by State Farm for his personal property under Coverage B, the district court held that Hale was not in compliance with the terms of the policy because he "failed to substantiate further payments with documentation before filing suit, despite State Farm's multiple reminders." J.A. 229. Because he was not in

7

compliance, the district court held that the policy prohibited Hale from filing suit. This appeal followed.

III.

"We review de novo a district court's decision to grant summary judgment, applying the same legal standards as the district court and viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Ballengee v. CBS Broad., Inc.*, 968 F.3d 344, 349 (4th Cir. 2020). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In cases where, as here, no response to the motion was filed, "the moving party must still show that the uncontroverted facts entitle the party to a judgment as a matter of law." *Custer v. Pan Am. Life Ins. Co.*, 12 F.3d 410, 416 (4th Cir. 1993) (cleaned up).

A.

Hale contends the district court erred by granting summary judgment against his claim seeking replacement value for the house under Coverage A of the policy. Hale concedes that the policy requires replacement of the house to be completed within two years of the fire, but he argues that Virginia law only requires substantial compliance with conditions precedent to coverage under a fire insurance policy. Although the sale of the new house closed more than two years after the fire, Hale signed the contract to purchase the house on November 2, 2020, less than two years after the fire. Hale therefore contends that he substantially complied with the two-year requirement and that he is entitled to pursue his replacement-cost claim against State Farm.

8

As Hale contends, it is clear under Virginia law[6] that, "in respect to fire policies, and in the absence of bad faith, the law requires of an insured only a reasonable and substantial compliance with the clauses, conditions and warranties of the policy." *Aetna Cas. & Sur. Co. v. Harris*, 239 S.E.2d 84, 88 (Va. 1977); *see Dabney v. Augusta Mut. Ins. Co.*, 710 S.E.2d 726, 731 (Va. 2011) ("It is well settled that performance of . . . a condition precedent to coverage . . . requires substantial compliance by the insured.") (cleaned up). The district court generally acknowledged the doctrine of substantial compliance, but the court stated that it "d[id] not find such compliance here" and rejected the argument without further explication. J.A. 230.

In our view, the information before the court showed the existence of a genuine issue of fact as to whether Hale substantially complied with the policy's requirement that replacement of the dwelling be complete within two years after the fire. *See Dabney*, 710 S.E.2d at 732 (questions about whether insured substantially complied with the policy's requirements generally must "be resolved by a fact finder"; only if the facts and inferences are "undisputed and certain" may the trial court resolve the issue as a matter of law).

The policy requires that a damaged dwelling actually be replaced within two years in order to receive replacement-cost benefits, and State Farm explained that provision in its letter accompanying the settlement checks. *See* J.A. 158 (explaining that Hale was

---

[6] In this diversity case, "we apply the law of Virginia and its choice of law rules." *Liberty Univ., Inc. v. Citizens Ins. Co. of Am.*, 792 F.3d 520, 528 (4th Cir. 2015). Virginia courts apply "Virginia substantive insurance law . . . to policies that are delivered to insureds in Virginia." *Id.*

9

entitled to additional, replacement cost benefits if he "[c]omplete[s] the actual . . . replacement of the . . . property within two years of the date of loss"). However, State Farm's letter also explained that it would "consider paying replacement cost benefits prior to actual . . . replacement if we determine . . . replacement costs *will be incurred* because . . . you present a signed contract acceptable to us." J.A. 158 (emphasis added). As noted above, the contract for the sale of the house was executed on November 2, 2020, less than two years after the date of the fire. Once the contract was signed, Hale and his co-signers were legally obligated to go forward with the purchase of the house, thus assuring that replacement costs "will be incurred." The purchase did in fact proceed, and the transfer of title was completed within a month after Hale signed the contract. Under these facts, we believe a jury could reasonably conclude that Hale substantially complied with the requirement that the house be replaced within two years of the date of the fire. If the jury finds substantial compliance, then—contrary to State Farm's argument on appeal—Hale was in fact eligible for replacement cost benefits at the time he filed his complaint.

Hale also contends that summary judgment was improper because he is entitled to challenge State Farm's determination of the actual cash value of the dwelling. We agree.

Homeowners in Virginia are entitled to pursue claims for both actual cash value payments and replacement cost payments. *See* Va. Code § 38.2–2119(B) ("Where any policy of insurance issued or delivered in this Commonwealth pursuant to this chapter provides for the payment of the full replacement cost of property insured thereunder, the policy shall permit the insured to assert a claim for the actual cash value of the property without prejudice to his right to thereafter assert a claim for the difference between the

10

actual cash value and the full replacement cost unless a claim for full replacement cost has been previously resolved."). The requirement that the replacement of the house be completed within two years after the fire—the policy provision upon which the district court grounded its analysis—applies only to claims for *replacement-cost* benefits. Thus, even if a jury were to reject Hale's replacement-cost claim, that would have no bearing on Hale's ability to challenge the amount State Farm offered as the actual cash value of the dwelling.

State Farm paid Hale $171,021.59 as the actual cash value of the dwelling at the time of the fire. It reached this figure by determining what it would cost to rebuild the house now ($300,329.08) and then subtracting from that amount depreciation ($106,089.11), general contractor's fees ($21,218.38), and the deductible under the policy ($2,000). *See* J.A. 157. Hale's timely complaint alleged that State Farm ignored the estimates he provided[7] that showed it would cost more than $400,000 to replace the house and that the amount offered by State Farm does not reflect the actual cash value of the dwelling. The record before the district court contains competent, admissible evidence supporting these allegations, including the inventories and valuation estimates given to State Farm by Hale and his daughter, and Hale's testimony in his recorded interview reflecting his disagreement with State Farm's calculations. *See, e.g., Haynes, Executrix v. Glenn*, 91

---

[7] State Farm notes in its brief that these estimates are not included in the record. There is no question, however, that the estimates exist and were given to State Farm, as State Farm acknowledged as much in a letter to Hale. *See* J.A. 140. That is sufficient for our purposes at this stage of the proceedings.

11

S.E.2d 433, 436 (Va. 1956) ("It is generally recognized that the opinion testimony of the owner of property, because of his relationship as owner, is competent and admissible on the question of the value of such property, regardless of his knowledge of property values.") (cleaned up). Because there are questions of fact about the cost to replace the dwelling and the actual cash value of the dwelling under Coverage A, the district court erred by granting summary judgment in favor of State Farm.[8]

Accordingly, we vacate the district court's order and remand for further proceedings on Hale's claim for replacement-cost benefits and his challenges to State Farm's calculation of replacement cost and actual cash value of the dwelling. On remand, the

---

[8] While Hale on remand may pursue his challenge to State Farm's calculations, we reject his claim that the different language used in Coverage A and Coverage B prohibits State Farm from deducting depreciation when calculating the actual cash value of the house under Coverage A. Coverage A requires State Farm to pay the "actual cash value" of the dwelling, but the policy does not define that phrase. J.A. 27. Coverage B, by contrast, does not use the phrase "actual cash value" at all, and instead provides that State Farm "will pay only the cost to repair or replace less depreciation." J.A. 28. Because the policy uses different language when describing the company's liability for payments under Coverage A and Coverage B, the explicit mention of a deduction for depreciation in Coverage B does not mean that Coverage A precludes the deduction of depreciation when calculating the actual cash value of the dwelling. Indeed, "replacement value minus depreciation" is a standard definition of "actual cash value," particularly in the insurance context. *See* Va. Code § 38.2-2119(A) (distinguishing between insurance providing coverage for "the actual cash value of the property at the time of loss" and insurance providing coverage for "the cost of repair or replacement of the property . . . within a reasonable time after the loss, and without deduction for depreciation") (cleaned up); *Black's Law Dictionary* (12th ed. 2024) (third definition of "value") (defining "actual cash value" in the insurance context as "[r]eplacement cost minus normal depreciation and obsolescence").

12

parties are free to assert any other claims or defenses under Coverage A that are not explicitly resolved in this opinion.[9]

B.

Hale also challenges the district court's rejection of his personal-property claim under Coverage B of the policy.

The district court held that the policy required an insured to be in compliance before commencing a lawsuit against State Farm and that Hale had not complied with his obligations under the policy. The court explained that Hale

> failed to substantiate further payments with documentation before filing suit, despite State Farm's multiple reminders. Thus, because Hale did not fulfill his obligations under the contract, he has not satisfied a condition precedent to filing suit and State Farm is excused from payments it might have owed had Hale complied.

J.A. 229. Hale contends that the policy does not require him to support his personal-property claim with receipts for each item lost, and he argues that he provided State Farm with all of the information and detail about the property that he could, given that most of

---

[9]     State Farm suggests in its brief that Hale's replacement-cost claim also fails because he did not timely notify State Farm that he had bought a new house and was seeking replacement cost benefits. The policy provides that notice of a claim for replacement benefits is timely if made "within six months of either: (a) the last date you received an actual cash value payment; or (b) the date of entry of a final order asserting your right to replacement cost settlement; whichever is later." J.A. 27. It is at least arguable that the conditions of subsection (b) would be met by a jury verdict in favor of Hale on the question of whether signing the purchase contract substantially complied with the two-year time period for replacing the dwelling, which would mean that the notice period remains open. We do not resolve that issue, however, and leave it for resolution on remand, as the question of notice was not addressed by the district court and is addressed only superficially in the briefs before this court.

13

his records were destroyed in the fire. Hale thus contends that he substantially complied

with the policy requirements and that the district court erred in rejecting his challenge to

State Farm's personal property valuation under Coverage B.

For its part, State Farm notes that the policy required Hale to provide inventories of

personal property destroyed in the fire that "[s]how in detail the quality, description, age,

replacement cost and amount of loss" for each item. J.A. 29. According to State Farm,

> [t]he issue was not that Hale had no records to substantiate his inventories. The issue was that his inventories themselves were incomplete and inaccurate, and they did not "[s]how in detail the quality, description, age, replacement cost and amount of loss" for each item he listed—as the policy required. Hale knew this, he failed to do anything about it, and then he stonewalled State Farm.

Brief of Respondent at 22-23 (cleaned up). State Farm contends that it carefully sorted

through Hale's non-compliant inventories and paid Hale "for the substantiated items based

on the documentation and testimony Hale had previously provided during his

examination," *id.* at 23, and that it refused to pay Hale for the personal property that was

not properly substantiated. State Farm contends that because it repeatedly sought additional

information from Hale about his personal-property claim and Hale refused to provide it,

Hale was not in compliance with the terms of the policy and his lawsuit was prohibited by

the terms of the policy.

State Farm's approach to this issue effectively demands strict and perfect

compliance by the insured with regard to the personal-property inventory. If any portion of

the inventory fails to provide sufficient detail and information about an item, State Farm's

position is that the insured is not in compliance with the policy and cannot bring suit against

14

State Farm. Even if the inventory is sufficiently detailed to permit State Farm to make payments on some of the items, State Farm contends that the insured's failure to provide complete information about other items means the insured is in breach of the policy and cannot sue State Farm at all, not even to challenge the payment amount on the property that was sufficiently substantiated.

However, as already discussed, Virginia law does not require strict compliance by the insured with the conditions of a fire insurance policy. Instead, "in respect to fire policies, and in the absence of bad faith, the law requires of an insured only a *reasonable and substantial compliance* with the clauses, conditions and warranties of the policy." *Aetna*, 239 S.E.2d at 88 (emphasis added); *see Allstate Ins. Co. v. Charity*, 496 S.E.2d 430, 431 (Va. 1998) ("[T]he insured retains the burden to show that the information actually provided constitutes *reasonable and substantial compliance* with the requirement that a proof of loss be submitted to the insurer.") (emphasis added). The district court recognized that only substantial compliance was required, but the court nonetheless granted summary judgment in favor of State Farm because it "d[id] not find such compliance here." J.A. 230. In our view, the information before the district court showed the existence of a genuine question of fact as to whether Hale substantially complied with his obligation to provide a sufficiently detailed inventory of the personal property lost in the fire.

Hale and his daughter provided State Farm with personal property inventories three times, and they corrected, updated, and improved the inventory with each submission. State Farm had pictures showing some of the interior of the house that had been taken by a real estate agent when the house was listed for sale, as well as pictures of some of the furniture

15

and contents that Hale had listed for sale on Facebook Marketplace. Hale and his daughter also sat for a lengthy interview under oath. They explained that most of the records were lost in the fire, and they attempted to answer State Farm's questions with as much detail as they could.

To be sure, Hale's inventories were far from perfect, and many of the entries provided no detail beyond a bare description of the item and an estimated value. Nonetheless, as State Farm itself argues, portions of the inventories were sufficiently detailed to permit payment. *See* Brief of Respondent at 23 (stating that Hale "did, in fact, substantiate the items he was paid for"); *id.* at 24 ("State Farm only paid the part of Hale's personal property claim that he substantiated."). Indeed, the inventories and other information provided by Hale were sufficiently detailed to permit State Farm to determine value and tender payment for the great majority of the items listed.

Hale's final personal-property inventory had 215 entries. State Farm's breakdown of its Coverage B payment tracks that final inventory, but it omits 27 entries that were included in Hale's final inventory and adds 5 entries that were *not* included in the final inventory. State Farm's breakdown shows 195 inventory entries and that State Farm made payment (in some amount) for the property listed in all but 21 of those entries. *See* J.A. 161-68. Even if we assume that all 21 of the zero-pay entries were denied because the description was inadequate and that all 27 of the omitted entries were omitted because the

16

items were insufficiently substantiated,[10] State Farm's own accounting shows that more than 75% of the entries (167 of 215) on Hale's inventories were sufficiently substantiated to permit State Farm to determine value and make payment.[11]

Based on this evidence, a reasonable factfinder could reject State Farm's assertion that Hale "refused" to comply with the policy and instead conclude that Hale made a good-faith effort to provide State Farm with all the information that he had about his personal property claim and that Hale substantially complied with the policy requirements. If Hale substantially complied with the policy requirements, then he is not prohibited by the terms of the policy from pursuing his claim challenging the amount State Farm paid under Coverage B. And as to that claim, the record shows that State Farm did not pay Hale for every item of personal property that he claimed was destroyed, and it sometimes paid less than the value assessed by Hale. Because Hale as property owner is competent to testify to the value of his own property, the record shows a genuine issue of fact as to whether State

---

[10]     It appears that many of the items were omitted not because the description was inadequate, but because the items should have been treated as fixtures and thus part of the claim for dwelling rather than personal property. *See* Brief of Respondent at 23 n.8.

[11]     We agree with State Farm that it did not, through its course of handling Hale's claims, waive the policy requirement that he submit an inventory with adequate detail. Nonetheless, State Farm's payment practices in this case do provide some evidence of the level of detail that is necessary to substantiate a claim. State Farm insists that it only paid the personal-property claims that were properly substantiated, but its breakdown of the Coverage B payment shows numerous instances where it paid Hale the full value he assigned for inventory items that included no detail at all beyond a simple description. Hale would be free at trial to rely on State Farm's payment practices to support his claim that the information he substantially complied with the policy's proof-of-loss requirements.

17

Farm paid Hale the full amount required by the policy. State Farm therefore failed to show its entitlement to summary judgment, and the district court erred by granting it.

State Farm's brief reveals its frustration with Hale's refusal to engage with the company on the resolution of his claim. As set out above, after the meeting between State Farm and Hale's attorney in October 2019, all communication from Hale's side of the fence stopped. Neither Hale nor his attorney responded to State Farm's repeated letters and attempts to make contact—not even after State Farm sent the settlement checks in April 2024. Hale simply remained silent until he filed suit on November 24, 2020, the two-year anniversary of the fire and last day of the limitations period established by the policy.

Hale's silence is a bit puzzling, and State Farm's frustration over the lack of communication is understandable. However, because Hale by then had already provided State Farm with his personal property inventories, his subsequent silence was not a breach of the policy terms. And while State Farm believes this action was improper and "surreptitiously fil[ed]," Brief of Respondent at 23, there is nothing in the policy that requires Hale to give advance warning that a lawsuit will be filed.[12] Hale's ability to prove his case may well be hampered by the limited evidence he has to support his claims of underpayment, but there is sufficient evidence in the record for Hale's claims to survive summary judgment.

---

[12]    The policy gives both parties the right to "demand that the amount of the loss be set by appraisal," J.A. 30, but neither side made such a request.

18

Accordingly, we vacate the district court's order and remand for further proceedings on Hale's challenges to the sufficiency of State Farm's payment under Coverage B of the policy. On remand, the parties are free to assert any other claims or defenses under Coverage B that are not explicitly resolved in this opinion.

IV.

For the reasons explained above, we hereby vacate the district court's grant of summary judgment in favor of State Farm and remand for further proceedings consistent with this opinion.

*VACATED AND REMANDED*